**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TOWN OF BARNSTABLE, MASSACHUSETTS; MARJON PRINT AND FRAME SHOP LTD.; HYANNIS MARINA, INC.; THE KELLER COMPANY, INC.; THE ALLIANCE TO PROTECT NANTUCKET SOUND; Sandra P. TAYLOR; and Jamie REGAN, | |
| Plaintiffs, | Civil Action No. 14-10148-RGS |
| v. | Leave to File Granted on April 14, 2014 |
| Ann G. BERWICK, in her official capacity as Chair of the Massachusetts Department of Public Utilities; Jolette A. WESTBROOK, in her official capacity as Commissioner of the Massachusetts Department of Public Utilities; David W. CASH, in his official capacity as Commissioner of the Massachusetts Department of Public Utilities; Mark SYLVIA, in his official capacity as Commissioner of the Massachusetts Department of Energy Resources;  CAPE WIND ASSOCIATES, LLC; and NSTAR ELECTRIC COMPANY, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO THE MOTIONS TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ................................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND.................................................................2

I.      Electricity Markets and the Division of Federal and State Regulation...............................2

II.     The Conduct of Massachusetts at Issue Here. ....................................................................3

III.    Summary of the Claims. .....................................................................................................6

STANDARD OF REVIEW ..................................................................................................7

ARGUMENT ......................................................................................................................7

I.      The Commonwealth's Sovereign Immunity Does Not Bar This Suit. ................................8

II.     The Court Should Not Abstain Under Burford...................................................................12

        A.      Adequate State-Court Review Was Not Available................................................12

        B.      None of the Grounds for Burford Abstention Are Present Here. ..........................13

III.    Issue Preclusion Does Not Apply. .....................................................................................16

IV.     The Complaint Presents a Concrete Controversy. ............................................................19

        A.      The Issues in This Case Are Fit for Judicial Decision..........................................19

        B.      Withholding Court Consideration Will Work a Hardship to the Parties. ..............22

V.      Plaintiffs' Claims Stem from State Action. .......................................................................23

        A.      DOER's Coercive Pressure Was State Action.......................................................24

        B.      The DPU's Approval of the Contract Propagated and Ratified DOER's
                Illegal Conduct.....................................................................................................26

VI.     There Are No Grounds to Dismiss the Preemption Claim. ................................................28

        A.      Both Section 1983 and the Supremacy Clause Itself Provide a Cause of
                Action....................................................................................................................28

        B.      The Allegations in the Complaint Establish a Clear Violation of the
                Supremacy Clause.................................................................................................32

1.     The Federal Power Act Occupies the Field of Wholesale Electricity Sales and Preempts Any State Action in That Field. ..............32

2.     Massachusetts Encroached on the Field Occupied by the Federal Power Act by Forcing NSTAR to Enter Into a Wholesale Electricity Contract and by Dictating the Contract's Rates and Terms. .....................................................................................36

C.     Defendants' Asserted Grounds for Dismissing the Preemption Claim Are Meritless......................................................................................39

1.     The State's Pike County Authority Does Not Permit It to Force a Utility to Enter Into a Wholesale Contract and Dictate Its Terms.............39

2.     FERC Has Never Addressed Any Argument Remotely Resembling Plaintiffs' Preemption Claim. ...................................................41

3.     FERC's Eventual Review of the Reasonableness of the NSTAR–Cape Wind Contract Rate Does Not Deprive This Court of Jurisdiction to Determine Whether Massachusetts Violated the FPA. .....................................................................................41

VII.     There Are No Grounds to Dismiss the Dormant Commerce Clause Claim. .....................42

A.     Plaintiffs Have Standing to Bring a Dormant Commerce Clause Claim..............43

B.     Massachusetts Violated the Commerce Clause by Forcing NSTAR to Enter Into a Contract with a Politically Favored In-State Generator.....................46

CONCLUSION.....................................................................................................................50

# TABLE OF AUTHORITIES

<span style="font-variant: small-caps">Cases</span>

*520 South Michigan Avenue Associates, Ltd. v. Shannon*, 549 F.3d 1119 (7th Cir. 2008) ..... 37-38

*Alba v. Raytheon Co.*, 809 N.E.2d 836 (Mass. 2004) .........................................................16, 17, 18

*Alliance of Automobile Manufacturers v. Gwadosky*, 430 F.3d 30 (1st Cir. 2005).......................44

*Allstate Insurance Co. v. Sabbagh*, 603 F.2d 228 (1st Cir. 1979) .................................................15

*American Trucking Associations v. City of Los Angeles*, 133 S. Ct. 2096 (2013)...................29, 31

*Appalachian Power Co. v. Public Service Commission of West Virginia*, 812 F.2d 898
    (4th Cir. 1987)..........................................................................................................................39

*Arizona v. United States*, 132 S. Ct. 2492 (2012) ........................................................................35

*Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission*, 461 U.S.
    375 (1983)................................................................................................................................35

*Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984) ....................................................................47

*Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County*, 115 F.3d 1372 (8th Cir.
    1997) .................................................................................................................................45, 46

*Boston Edison Co. v. City of Boston*, 459 N.E.2d 1231 (Mass. 1984) ...........................................9

*Bourque v. Cape Southport Associates, LLC*, 800 N.E.2d 1077 (Mass. App. Ct. 2004).........16, 17

*Brown v. Hotel & Restaurant & Bartenders Employees International Union Local 54*,
    468 U.S. 491 (1984).................................................................................................................32

*Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001) ..............................................34

*Burford v. Sun Oil Co.*, 319 U.S. 315 (1943)..........................................................................12, 14

*C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994) ................................................46

*Cablevision System Corp. v. Department of Telecommunications & Energy*, 702 N.E.2d
    799 (Mass. 1998) .....................................................................................................................12

*California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831 (9th Cir. 2004)....................................38

*Californians for Renewable Energy, Inc. (CARE) v. National Grid*, 137 FERC ¶ 61,113
    (2011)......................................................................................................................................41

*Central Vermont Public Service Corp.*, 84 FERC ¶ 61,194 (1998)..............................................40

*Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334 (1992)................................47

*Chico Service Station, Inc. v. Sol Puerto Rico Ltd.*, 633 F.3d 20 (1st Cir. 2011).........15

*In re Commonwealth Gas Co.*, 1999 WL 395641 (Mass. DPU 1999) ..........................9

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) ................................32

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006)................................................45

*Dartmouth-Hitchcock Clinic v. Toumpas*, No. 11-cv-358-SM, 2012 WL 4482857 (D.N.H. Sept. 27, 2012) ....................................................................................................30

*Douglas v. Independent Living Center of Southern California, Inc.*, 132 S. Ct. 1204 (2012)..........................................................................................................30, 31

*Family Winemakers of California v. Jenkins*, 592 F.3d 1 (1st Cir. 2010) .........47, 48, 49

*Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982) .............32

*FPC v. Florida Power & Light Co.*, 404 U.S. 453 (1972)..............................................3

*FPC v. Southern California Edison Co.*, 376 U.S. 205 (1964)....................33, 36, 37, 40

*Fragoso v. Lopez*, 991 F.2d 878 (1st Cir. 1993) ........................................................15

*Gastronomical Workers Union Local 610 v. Dorado Beach Hotel Corp.*, 617 F.3d 54 (1st Cir. 2010) ..............................................................................................................20

*General Motors Corp. v. Tracy*, 519 U.S. 278 (1997)............................................44, 45

*Georgia v. McCollum*, 505 U.S. 42 (1992)..................................................................24

*Granholm v. Heald*, 544 U.S. 460 (2005)......................................................................1

*Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508 (1st Cir. 2009).....................15

*Hostar Marine Transport Systems, Inc. v. United States*, 592 F.3d 202 (1st Cir. 2010) .......................................................................................7, 19, 24, 36, 39

*Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178 (1st Cir. 1999) ...........46

*Jarosz v. Palmer*, 766 N.E.2d 482 (Mass. 2002) ........................................................19

*Kentucky West Virginia Gas Co. v. Pennsylvania Public Utility Commission*, 837 F.2d 600 (3d Cir. 1988)......................................................................................................39

*KG Urban Enterprises, LLC v. Patrick*, 693 F.3d 1 (1st Cir. 2012)..............................21

*KG Urban Enterprises, LLC v. Patrick*, 839 F. Supp. 2d 388 (D. Mass. 2012), *aff'd in relevant part, vacated in part*, 693 F.3d 1 (1st Cir. 2012) .................................................. 31-32

*Local Union No. 12004, United Steelworkers of America v. Massachusetts*, 377 F.3d 64 (1st Cir. 2004) ...........................................................................................................29

*Massachusetts Retirement System v. CVS Caremark Corp.*, 716 F.3d 229 (1st Cir. 2013) ...........7

*Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1988).....................33

*Morgan Stanley Capital Group, Inc. v. Public Utility District Number 1 of Snohomish County*, 554 U.S. 527 (2008) ...............................................................................................4

*Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986) ......................34, 36, 37, 38, 40

*National Association of Government Employees v. Mulligan*, 849 F. Supp. 2d 167 (D. Mass. 2012)........................................................................................................................13

*National Meat Ass'n v. Harris*, 132 S. Ct. 965 (2012) .................................................................29

*National Railroad Passenger Corp. v. McDonald*, No. 12 CV 2731, -- F. Supp. 2d --, 2013 WL 5434618 (S.D.N.Y. Sept. 26, 2013)......................................................................10

*New England Legal Foundation v. Massachusetts Port Authority*, 883 F.2d 157 (1st Cir. 1989) ...................................................................................................................................38

*New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982) ...........................33, 36, 37, 40

*New Hampshire Motor Transport Ass'n v. Rowe*, 448 F.3d 66 (1st Cir. 2006), *aff'd*, 552 U.S. 364 (2008)..................................................................................................................38

*New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350 (1989) ...........................................................................................................12, 13, 14, 15, 29

*New York v. FERC*, 535 U.S. 1 (2002) .......................................................................................34

*Northern Natural Gas Co. v. State Corp. Commission*, 372 U.S. 84 (1963)................................38

*NSTAR Electric & Gas Corp. v. FERC*, 481 F.3d 794 (D.C. Cir. 2007).........................................3

*Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18 (1st Cir. 2007)....................................21

*Pennsylvania Water & Power Co. v. FPC*, 193 F.2d 230 (D.C. Cir. 1951), *aff'd*, 343 U.S. 414 (1952)..........................................................................................................................34

*Pharmaceutical Research & Manufacturers of America v. Concannon*, 249 F.3d 66 (1st Cir. 2001), *aff'd*, 538 U.S. 644 (2003) ...................................................................................29

*Pike County Light & Power Co. v. Pennsylvania Public Utility Commission*, 465 A.2d 735 (Pa. Commw. Ct. 1983) ...............................................................................39

*PPL Energyplus, LLC v. Hanna*, No. 11-745, -- F. Supp. 2d --, 2013 WL 5603896 (D.N.J. Oct. 11, 2013) ...............................................................34, 35, 36, 37, 40

*PPL Energyplus, LLC v. Nazarian*, No. MJG-12-1286, -- F. Supp. 2d --, 2013 WL 5432346 (D. Md. Sept. 30, 2013) ...........................................34, 35, 36, 37, 40, 41

*Public Service Co. of New Hampshire v. Patch*, 221 F.3d 198 (1st Cir. 2000)............................15

*Public Utilities Commission of Rhode Island v. Attleboro Steam & Electric Co.*, 273 U.S. 83 (1927)..........................................................................................................34

*Puerto Rico Telephone Co. v. Municipality of Guayanilla*, 450 F.3d 9 (1st Cir. 2006) ...............30

*Quackenbush v. Allstate Insurance Co.*, 517 U.S. 706 (1996) .................................................12, 13

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947)...............................................................32

*Richards v. Jefferson County*, 517 U.S. 793 (1996) ...................................................................16

*Riva v. Massachusetts*, 61 F.3d 1003 (1st Cir. 1995) .............................................................21, 23

*Robinson v. Department of Public Utilities*, 624 N.E.2d 951 (Mass. 1993)................................12

*Rowe v. New Hampshire Motor Transportation Ass'n*, 552 U.S. 364 (2008) ..............................29

*Sevigny v. Employers Insurance of Wausau*, 411 F.3d 24 (1st Cir. 2005)....................................15

*Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983)..............................................................28, 29

*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984)...............................................................35

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1 (1st Cir. 2012) ..............19, 22

*Staub v. Proctor Hospital*, 131 S. Ct. 1186 (2011)....................................................................27

*Stern v. United States District Court for District of Massachusetts*, 214 F.3d 4 (1st Cir. 2000) .......................................................................................................................20

*Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997) ...........................................................................8

*Taylor v. Sturgell*, 553 U.S. 880 (2008)....................................................................................16

*Trailer Marine Transport Corp. v. Rivera-Vazquez*, 931 F.2d 961 (1st Cir. 1991) .....................15

*Transmission Access Study Policy Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000) ...................34

*Tyler v. Massachusetts*, No. Civ. A. 13-11988, -- F. Supp. 2d --, 2013 WL 5948092 (D. Mass. Nov. 7, 2013) ............................................................................................................10, 11

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Management Authority*, 550 U.S. 330 (2007) ......................................................................................................................................46

*United States v. Bank of New England, N.A.*, 821 F.2d 844 (1st Cir. 1987) ................................27

*Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464 (1st Cir. 2009) ......................................13

*Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002) ...............................................................................................................................8, 9, 10

*Verizon New England, Inc. v. International Brotherhood of Electric Workers, Local No. 2322*, 651 F.3d 176 (1st Cir. 2011) ...............................................................................20, 22

*West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186 (1994) .......................................................1, 46

*Weaver's Cove Energy, LLC v. Rhode Island Coastal Resources Management Council*, 589 F.3d 458 (1st Cir. 2009) ..........................................................................................................43

*Whalen v. Massachusetts Trial Court*, 397 F.3d 19 (1st Cir. 2005) ............................................10

*Wos v. E.M.A. ex rel. Johnson*, 133 S. Ct. 1391 (2013) .........................................................29, 31

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992) ...............................................................................46

*Ex parte Young*, 209 U.S. 123 (1908) ...............................................................................................8

## CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. art. VI, cl. 2 .............................................................................................................1, 32

16 U.S.C. § 824(a) .............................................................................................................................33

16 U.S.C. § 824(b)(1) .....................................................................................................................3, 33

16 U.S.C. § 824(c) ...............................................................................................................................3

16 U.S.C. § 824d(a) .......................................................................................................................33, 36

16 U.S.C. § 824e .................................................................................................................................33

1997 Mass. Acts Ch. 164 § 1 ...............................................................................................................2

**OTHER AUTHORITIES**

Description of the Restructured Electric Industry, http://www.mass.gov/eea/energy-
   utilities-clean-tech/electric-power/electric-market-info/electric-industry-
   restructuring/description-of-the-restructured-electric-industry.html .........................................2

*The Federalist* No. 44 (James Madison) (Clinton Rossiter ed., 1961) .............................................

ISO-New England, "How Electricity Flows," http://iso-ne.com/nwsiss/grid_mkts/elec_
   works/index.html ......................................................................................................................3

## INTRODUCTION

Although many of the Plaintiffs oppose Cape Wind on policy grounds, this case is not about whether Cape Wind is a good idea.  Nor is it a case about the virtues of renewable energy. This case is about whether Massachusetts can promote the Cape Wind project by regulating in a field occupied by federal law and by insulating Cape Wind from interstate competition, to the financial detriment of Plaintiffs and all of the citizens of Cape Cod.  Under well-established principles of constitutional law, it cannot.

In the years immediately following independence, our nation was plagued by economic "Balkanization," as the states under the Articles of Confederation passed numerous measures to protect in-state industries from interstate competition.  *Granholm v. Heald*, 544 U.S. 460, 472 (2005) (quotation marks omitted).  The Constitution contains two provisions intended to prevent such Balkanization.  First, the Supremacy Clause makes federal law "the supreme law of the land," U.S. Const. art. VI, cl. 2, permitting Congress to establish a uniform national policy and to preempt states' parochial legislation.  *See, e.g.*, *The Federalist* No. 44, at 287 (James Madison) (Clinton Rossiter ed., 1961).  Second, the "'negative' [or 'dormant'] aspect of the Commerce Clause prohibits economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."  *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 192 (1994) (quotation marks omitted).  In its zeal to promote the politically favored Cape Wind project, Massachusetts violated both of those constitutional provisions by forcing NSTAR, an electric utility in Massachusetts, to enter into an above-market wholesale electricity contract with Cape Wind, a Massachusetts-based generator, at a price dictated by the state.

Defendants have mainly raised procedural objections to this suit, including sovereign immunity, abstention, preclusion, and standing.  But Defendants misconstrue the operative case

law and ignore critical allegations in the complaint.  As to the argument that the Commonwealth

did not, in fact, force NSTAR into the Cape Wind contract (a claim which, notably, NSTAR does

not itself make), Defendants rely on factual assertions inappropriate for a motion to dismiss.  The

complaint alleges in detail the means by which the Commonwealth forced NSTAR into the Cape

Wind contract.  Defendants may contest those allegations at a later stage of the case, but on these

motions to dismiss, they must be accepted as true.

## FACTUAL AND PROCEDURAL BACKGROUND

**I.      Electricity Markets and the Division of Federal and State Regulation.**

Utilities like Defendant NSTAR acquire electricity from independent power generation

companies that own and operate power plants.  Utilities then resell that electricity to their end-

use, or "retail," customers.[1]  Utilities also "deliver" or "distribute" electricity to retail customers

using the utility's wires and cables.  Every end-user of electricity within a utility's service area

relies on the utility to distribute electricity, and pays a distribution charge to the utility for that

service; but end-users are free, under Massachusetts law, to choose whether to purchase the

electricity itself from the utility or from an alternative retail electric supplier.[2]

Utilities (and other retail electric suppliers) acquire the electricity that they resell to their

retail customers through federally regulated wholesale markets or through federally regulated

wholesale contracts.  As discussed fully below, the Federal Power Act ("FPA") created the

---

[1] While historically utilities in Massachusetts like NSTAR owned power plants themselves and
generated the electricity that they then sold to their customers, in 1997 Massachusetts decided to
restructure its electricity industry in order to make electricity generation a competitive industry.
*See* 1997 Mass. Acts Ch. 164 § 1.

[2] Utilities also continue to supply electricity to "default" customers who have not chosen an
alternative retail electric supplier.  *See* "Description of the Restructured Electric Industry,"
http://www.mass.gov/eea/energy-utilities-clean-tech/electric-power/electric-market-info/electric-
industry-restructuring/description-of-the-restructured-electric-industry.html

Federal Energy Regulatory Commission ("FERC")[3] and gave it exclusive authority to regulate these wholesale electricity transactions. *See* 16 U.S.C. § 824(b)(1) (giving FERC jurisdiction over "the sale of electric energy at wholesale in interstate commerce").[4]  Although the FPA reserved for states the authority to regulate *retail* electricity transactions, the FPA "occupied the field" of *wholesale* electricity transactions and thus preempted *any* state regulation in that field. *See infra* pp. 32-36 (citing sources).  In New England, FERC has exercised its authority over wholesale sales to establish an interstate market for wholesale electricity, which is administered by an organization called "ISO-New England."[5]  Although the market is complicated, it essentially operates on market-based principles, so that price is set at the intersection of demand and supply. *See, e.g.*, *NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 796 (D.C. Cir. 2007). That design encourages companies to operate and develop reliable, efficient generators and discourages companies from maintaining or developing inefficient, expensive generators.

## II.    The Conduct of Massachusetts at Issue Here.

Massachusetts Governor Deval Patrick has long favored one particular generation company in Massachusetts: Cape Wind, a massive wind turbine project that its developers plan to build in Nantucket Sound between Cape Cod, Martha's Vineyard, and Nantucket.  Promoting Cape Wind was a centerpiece of Governor Patrick's election campaign.  Compl. ¶ 38.

---

[3] FERC was originally called the Federal Power Commission but was later renamed.

[4] Electricity in interstate commerce includes any energy "transmitted from a State and consumed at any point outside thereof."  16 U.S.C. § 824(c).  That definition encompasses purely "in-state" electricity that is commingled with electricity transmitted out of state. *See FPC v. Florida Power & Light Co.*, 404 U.S. 453, 463 (1972).  Thus, a wholesale sale of electricity is subject to federal jurisdiction so long as the electricity is transmitted on lines that are interconnected with an interstate grid – and that includes all the electricity at issue in this case.

[5] *See* ISO-New England, "How Electricity Flows," http://iso-ne.com/nwsiss/grid_mkts/ elec_works/index.html.

But Cape Wind has a problem:  Locating wind turbines in Nantucket Sound is costly, and thus Cape Wind's electricity is far more expensive than other generators' electricity, even comparing Cape Wind to other *renewable* generators.  *Id.* ¶ 9.  Cape Wind cannot survive on the competitive prices in the  wholesale market administered by ISO-New England.  Instead, Cape Wind must seek out above-market bilateral wholesale contracts to sell its power.  *Id.* ¶¶ 10-11. FERC permits such bilateral contracts, but only if the transaction is voluntary and freely negotiated.  *See Morgan Stanley Capital Grp., Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 554 U.S. 527, 537 (2008) (explaining that FERC permits "sellers of wholesale electricity to file 'market-based' tariffs" that allow "the seller [to] enter into freely negotiated contracts with purchasers").

Cape Wind secured one such above-market contract with the Massachusetts utility National Grid to purchase half of Cape Wind's output.  Compl. ¶¶ 46-52.  NSTAR, however, refused to purchase Cape Wind's expensive electricity.  When NSTAR put out a request for proposals for electricity from renewable sources (under the Massachusetts Green Communities Act, utilities are required to purchase a certain amount of electricity from such "green" sources, *see id.* ¶¶ 42-45), it chose to purchase renewable electricity from three far less expensive, land-based wind generators.  *Id.* ¶¶ 53-58.  At that point, Cape Wind could not find a buyer for the other half of its high-priced electricity, and the viability of Cape Wind – and the energy policy of the Patrick Administration – was in question.

Things changed, however, when NSTAR sought permission to merge with two other utilities.  Under Massachusetts law, the Commonwealth's Department of Public Utilities ("DPU") must approve all mergers of utilities, *id.* ¶ 59, and that approval process gave the

Patrick Administration the leverage it needed to force NSTAR to accept an above-market

contract with Cape Wind.

Shortly after NSTAR filed its merger approval request with the DPU, the

Commonwealth's Department of Energy Resources ("DOER") – a state agency under the direct

control of the Patrick Administration – moved to stay the merger proceeding on the ground that

NSTAR was not sufficiently devoted to the Patrick Administration's renewable energy policy.

DOER's blessing was critical to gaining the DPU's approval of a merger, and DOER's stay

request stopped the merger cold.  *Id.* ¶¶ 68-72.  DOER submitted a filing to the DPU contending

that, as a condition of the merger, the DPU should require NSTAR to purchase wind energy.  *Id.*

¶ 70.  The message from the Patrick Administration was clear:  either NSTAR entered into a

favorable, above-market contract with Cape Wind, or DOER would delay the merger long

enough to kill it.  *Id.*  It was a classic case of regulatory hold-up.

At first, NSTAR resisted the Patrick Administration's regulatory pressure, *id.* ¶ 73, but

when it became clear that the merger was in jeopardy, NSTAR met in secret with Patrick

Administration officials and acceded to their demands, *id.* ¶¶ 75-81.  The result was a signed

"Settlement Agreement"[6] in which DOER agreed to drop its stay and support the merger, and

NSTAR agreed that it would enter into a wholesale electricity contract with Cape Wind.  *Id.*

¶ 76.  The Settlement Agreement provided that the NSTAR–Cape Wind contract must have the

same above-market price and favorable terms as the National Grid–Cape Wind contract.  *Id.*  It

also provided that the NSTAR–Cape Wind contract would be effective only if it were approved

by the DPU – a condition the DPU expressly ratified.  *Id.* ¶ 82.

---

[6] The Settlement Agreement is Exhibit 5 of the State Defendants' Memorandum, ECF No. 38-5.

Shortly thereafter, NSTAR and Cape Wind signed the wholesale contract[7] contemplated

by the Settlement Agreement – with a price identical to that contemplated by the Settlement

Agreement – and the NSTAR merger was approved.  *Id.* ¶¶ 82-86.  The DPU then issued Order

12-30[8] approving the NSTAR-Cape Wind contract.  Order 12-30 also allowed NSTAR to charge

every customer to whom it *distributes* electricity (including Plaintiffs) for the entire cost of the

above-market contract – regardless of whether those customers purchase electricity from

NSTAR or from another retail supplier.  *Id.* ¶¶ 90-92, 96; Order 12-30, at 185-87.  In other

words, the scheme was designed to provide Cape Wind with a wholesale price support, while

passing the cost on to people, like Plaintiffs, who live or operate businesses in NSTAR's service

territory.

### III.   Summary of the Claims.

By forcing NSTAR to enter into a wholesale electricity contract with Cape Wind, and by

setting the price and terms of that contract, the Commonwealth violated the Supremacy Clause

and the dormant Commerce Clause.

*Supremacy Clause*.  In passing the Federal Power Act, Congress "occupied the field" of

wholesale electricity sales and preempted any state action in that field.  It would unquestionably

encroach on that exclusively federal field if Massachusetts were to pass a *statute* requiring

NSTAR to enter into a wholesale contract and setting that contract's rate and terms.  And it is no

different where, as here, state regulators used their regulatory leverage over a merger request to

achieve the same result.  Either way, Massachusetts acted in the field occupied by the Federal

---

[7] The NSTAR–Cape Wind contract – called a "Power Purchase Agreement" – is Exhibit 9 of the State Defendants' Memorandum, ECF No. 38-9.

[8] DPU Order 12-30 is Exhibit 10 of the State Defendants' Memorandum, ECF No. 38-10.

Power Act by forcing NSTAR to enter the Cape Wind contract, and by dictating the particular price and terms of that contract.

*Dormant Commerce Clause*.  The Commerce Clause prohibits states from using their regulatory power to guarantee a market for in-state producers at the expense of out-of-state competitors.  By forcing NSTAR into an above-market contract with Cape Wind, the Commonwealth discriminated against Cape Wind's out-of-state competitors which could have provided renewable energy at a lower price.  Massachusetts thereby engaged in exactly the sort of economic protectionism that the dormant Commerce Clause prohibits.

## STANDARD OF REVIEW

On a motion to dismiss, the Court must "accept[] as true all well-pleaded facts in the complaint and draw[] all reasonable inferences in the plaintiffs' favor."  *Hostar Marine Transp. Sys., Inc. v. United States*, 592 F.3d 202, 207 (1st Cir. 2010).  To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Mass. Retirement Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 237 (1st Cir. 2013) (quotation marks omitted).

## ARGUMENT

Defendants make seven arguments in seeking dismissal: (1) the suit is barred by sovereign immunity, *see* State Mem. 13-16; (2) this Court should abstain from exercising jurisdiction, *see* State Mem. 16-19; (3) certain plaintiffs are precluded, *see* State Mem. 19-21; (4) Plaintiffs lack standing and their claims are not ripe, *see* NSTAR Mem. 5-11; (5) Plaintiffs fail to trace their injury to any state action, *see* State Mem. 26; Cape Wind Mem. 18-20; (6) Plaintiffs fail to state a claim for preemption, *see* State Mem. 21-26; Cape Wind Mem. 9-16; and (7) Plaintiffs lack standing and fail to state a claim for a violation of the dormant Commerce Clause, *see* State Mem. 27-30; Cape Wind Mem. 16-18.  Each of these arguments is meritless.

I.      **The Commonwealth's Sovereign Immunity Does Not Bar This Suit.**

Defendants first contend that Plaintiffs' suit is barred by sovereign immunity because Plaintiffs allegedly seek "completely retrospective" relief.  State Mem. 13-16.  That is incorrect.  The NSTAR–Cape Wind contract approved by Order 12-30 will last for fifteen years and authorizes NSTAR, on a prospective basis, to purchase Cape Wind's electricity periodically throughout the life of the contract.  Critically, moreover, Plaintiffs are the ones who will pay the above-market rates each time NSTAR makes a purchase.  To remedy that injury, Plaintiffs seek a purely prospective injunction against enforcement of DPU Order 12-30.[9]

Plaintiffs' claims fall squarely within those authorized by *Ex parte Young*, 209 U.S. 123 (1908).  "In determining whether the doctrine of *Ex Parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."  *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002).  Here, Plaintiffs satisfy both elements of that test.

First, Plaintiffs have alleged an "ongoing violation of federal law."  *Id.*  DPU Order 12-30 is akin to a statutory license giving NSTAR ongoing authority to procure electricity at the rates and terms that the Commonwealth illegally dictated in the NSTAR–Cape Wind contract.  Moreover, not only does DPU Order 12-30 authorize NSTAR to procure electricity at illegally-set rates, but it also authorizes NSTAR to pass on its costs to customers – including Plaintiffs.  *See* Order 12-30, at 186, 189 (directing NSTAR to file a new tariff conforming to the rates and

---

[9] Plaintiffs also request "any other necessary injunctive relief to remedy the violation" of federal law.  Compl., Prayer for Relief (d).  That is in accord with the First Circuit's holding that, so long as a complaint properly requests "prospective equitable relief against state officials," sovereign immunity does not bar the claim, and the Eleventh Amendment "does not place limits on the scope of the equitable relief that may be granted once appropriate jurisdiction is found." *Strahan v. Coxe*, 127 F.3d 155, 158, 166-67 (1st Cir. 1997).

conditions approved in the Order). DPU's continuing authorization for NSTAR to procure electricity at illegally-set rates – and pass on those rates to NSTAR's customers – constitutes an ongoing violation of federal law.

Indeed, if the Commonwealth had enacted a *statute* that prospectively required NSTAR to buy power from Cape Wind at a particular price and pass on those costs to consumers, there would be no doubt that such a statute constituted an "ongoing violation of federal law." Massachusetts law, however, treats a rate approved by DPU as the functional equivalent of statute. *See Boston Edison Co. v. City of Boston*, 459 N.E.2d 1231, 1233, 1235 (Mass. 1984) (holding that "[t]he process of utility rate making by a public regulatory body is the exercise of a legislative function" and that rates have "the rigidity of a quasi statutory enactment"); *In re Commonwealth Gas Co.*, 1999 WL 395641, at *6 n.2 (Mass. DPU 1999) ("[T]he basis of the rates and service relationship between a company and its customer is tariffed and therefore legislative."). Thus, the Commonwealth's illegal conduct cannot be cloaked by sovereign immunity merely because the Commonwealth acted through a DPU order rather than a statute.

Second, Plaintiffs request "relief properly characterized as prospective," *Verizon*, 535 U.S. at 646, because they seek to enjoin the ongoing, prospective application of DPU Order 12-30 for the next fifteen years. Compl., Prayer for Relief (d). Enjoining Order 12-30 would provide *prospective* relief by nullifying NSTAR's license and relieving Plaintiffs of the injury of paying the inflated electricity rates caused by the Commonwealth's unconstitutional conduct.

State Defendants contend that they have sovereign immunity because they will engage in no "future conduct . . . with respect to the contract." State Mem. 15. But that is both legally irrelevant and factually incorrect. It is legally irrelevant because, to obtain relief under *Ex Parte Young*, Plaintiffs need not show whether the state officials will engage in "future conduct . . .

with respect to the contract," State Mem. 15; rather, Plaintiffs need only show "an ongoing violation of federal law" and seek "relief properly characterized as prospective." *Verizon*, 535 U.S. at 646. As explained above, Plaintiffs have met both burdens. Moreover, it is factually incorrect because State Defendants clearly will engage in "future conduct . . . with respect to the contract." State Mem. 15. DPU Order 12-30 states that the DPU will exercise its ongoing regulatory authority to monitor compliance with its terms. *See, e.g.*, Order 12-30, at 189 (stating that the DPU "will review NSTAR Electric's recovery of above-market costs in its annual reconciliation filings" to "ensure that the Company recovers such costs appropriately"). If the Court enjoins DPU Order 12-30, then the injunction would prospectively strip the DPU of its authority to enforce the illegal terms of that order.

Plaintiffs' claim for declaratory relief likewise is not barred by sovereign immunity. *Verizon* held that sovereign immunity posed no barrier to Verizon's requested declaratory relief because, although the declaration would affect "the past financial liability of private parties," it would not impose financial liability on the state. 535 U.S. at 646. Here, too, the requested declaratory relief – which would declare the DPU's approval of the NSTAR–Cape Wind contract to be unconstitutional, *see* Compl. Prayer for Relief (b), (c) – may affect Cape Wind's financial liability, but it imposes no financial liability on the Commonwealth or any State Defendant. *Id.*[10]

State Defendants rely heavily on *Tyler v. Massachusetts*, No. 13-11988-RGS, 2013 WL 5948092 (D. Mass. Nov. 7, 2013) (cited in State Mem. 13, 16), but that case is far afield. In

---

[10] That distinguishes this case from *Whalen v. Massachusetts Trial Court*, 397 F.3d 19 (1st Cir. 2005) (cited in State Mem. 14). In that case, a requested injunction would have forced the state to pay a pension to a state employee; thus it clearly sought money from the state treasury. Here, the requested declaratory relief would impose no financial liability on the Commonwealth. Likewise, in *National Railroad Passenger Corp. v. McDonald*, No. 12 CV 2731, __ F. Supp. 2d __, 2013 WL 5434618 (S.D.N.Y. Sept. 26, 2013) (cited by State Defendants Mem. 15) – a suit challenging the state's past exercise of eminent domain – the requested relief was entirely retrospective. *Id.* at *11, 13.

*Tyler*, the plaintiff had been raped and gave birth to a child, and a state judge ordered the rapist to acknowledge paternity of the child as a condition of probation.  He did so and then sought visitation rights from the state probate court.  The plaintiff brought suit claiming that the state court's imposition of the paternity condition violated her substantive due process rights.  *Id.* at *1.  This Court concluded that it lacked jurisdiction because, among other things, "[t]he relief sought . . . [was] not prospective."  *Id.* at *2.

Critically, however, the relief sought in *Tyler* was "not prospective" only because the state court had not yet reached a decision on the rapist's visitation rights.  *See id.* at *2 n.3.  The federal court had no jurisdiction to enjoin the probation condition itself, because "[t]he sentence complained of ha[d] been imposed and [wa]s now an historical fact."  *Id.* at *2.  But the court implied that once visitation rights were awarded, a "controversy [would] exist" and the plaintiff could bring suit in federal court to enjoin the ongoing application of the award of visitation rights.  *Id.* at *2 n.3.

DPU Order 12-30 is easily distinguishable from the probation condition in *Tyler*.  DPU Order 12-30 constitutes an ongoing legal entitlement for NSTAR to pay certain rates to Cape Wind and pass them down to consumers, whereas the probation condition did not constitute an ongoing legal entitlement in any way.  Moreover, DPU Order 12-30 contemplates an ongoing enforcement role for DPU, whereas the rapist's acknowledgment of paternity did not require any ongoing enforcement.  Indeed, if there is any analogy to be drawn to *Tyler*, Plaintiffs are in the position that the *Tyler* plaintiff would have been in had the state court already awarded visitation rights.  Like an award of visitation rights, DPU Order 12-30 has prospective application and imposes ongoing injury on Plaintiffs in the form of elevated electricity rates over fifteen years.  Plaintiffs are not challenging a "historical fact."  *Tyler*, 2013 WL 5948092 at *2.  Rather, they

11

are challenging, and seeking relief from, the future application of Order 12-30, and its effects on the Plaintiffs.

## II.     The Court Should Not Abstain Under *Burford*.

State Defendants next contend that this Court should abstain under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), because Plaintiffs allegedly could have raised their claims on direct review of DPU Order 12-30.  State Mem. 16-19.  That contention fails.

### A.     Adequate State-Court Review Was Not Available.

*Burford* abstention applies only "[w]here timely and adequate state-court review is available," *New Orleans Public Service, Inc. v. Council of City of New Orleans* ("*NOPSI*"), 491 U.S. 350, 361 (1989), because "[u]ltimately, what is at stake" in *Burford* abstention is "a federal court's decision . . . that a dispute would best be adjudicated in a state forum," *Quackenbush v. Allstate Insurance Co.*, 517 U.S. 706, 728 (1996).  Here, "timely and adequate state-court review," *NOPSI*, 491 U.S. at 361, was *not* available to Plaintiffs Hyannis Marina, Marjon Print & Frame Co., the Keller Company, the Town of Barnstable, Sandra Taylor, and Jamie Regan. They were not parties before the DPU and thus were not entitled to seek review of the DPU's order in state court.  *See Robinson v. Dep't of Pub. Utils.*, 624 N.E.2d 951, 953 & n.3 (Mass. 1993) (even a limited intervenor in proceedings before the agency is not an "aggrieved party in interest" and has no right to appeal a DPU order under Mass. G.L. c. 25 § 5); *Cablevision Sys. Corp. v. Dep't of Telecomms. & Energy*, 702 N.E.2d 799, 800 (Mass. 1998) (same).[11]  Even if those Plaintiffs had attempted to appear before the DPU, moreover, the DPU would have denied

---

[11] State Defendants note that in a *different* DPU proceeding, No. 12-19, Plaintiff the Alliance to Protect Nantucket Sound ("Alliance") stated that it was representing the Town of Barnstable's interests.  State Mem. 10 n.11.  That is irrelevant because the Alliance did *not* claim to represent the Town of Barnstable's interests in the DPU proceeding at issue here, DPU 12-30.  *See* State Defendants' Mem. at 11 n.14; *see also infra* p. 17 n.15.

intervenor status – and cut off their ability to appeal – because the DPU had already held that the interests of ratepayers were adequately represented by the Attorney General in the proceeding. *See* DPU Hearing Officer Ruling on Petitions to Intervene, DPU 12-30, at 5, 12 (June 5, 2012) (denying intervention petition of Plaintiff Sandra Taylor).[12]

*Burford*, therefore, is inapplicable.  The state-court review process could not provide an "adequate" remedy when it was unavailable to all but one of the Plaintiffs.  *See Nat'l Ass'n of Gov't Emples. v. Mulligan*, 849 F. Supp. 2d 167 175 (D. Mass. 2012) (rejecting *Burford* abstention when state-court remedy was available to only 11 of 100 members represented by the plaintiff).

## B.     None of the Grounds for *Burford* Abstention Are Present Here.

Even putting aside the unavailability of state-court review, *Burford* abstention is inappropriate.  Federal courts have a "virtually unflagging" obligation to adjudicate claims within their jurisdiction, *NOPSI*, 491 U.S. at 359 (quotation marks omitted), and "*Burford* represents an extraordinary and narrow exception to [that] duty," *Quackenbush*, 517 U.S. at 728 (internal quotation marks omitted).  In particular, "[a] federal court need not abstain from hearing a case involving state regulatory administration 'merely because resolution of a federal question may result in the overturning of a state policy.'" *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 473 (1st Cir. 2009) (quoting *Zablocki v. Redhail*, 434 U.S. 374, 379 n.5 (1978)).  Thus, Defendants face a high bar in urging *Burford* abstention, and they have not even approached it.

---

[12] The Ruling on Ms. Taylor's Petition to Intervene is available at http://www.env.state.ma.us/dpu/docs/electric/12-30/6512dpurul.pdf.  State Defendants note that the Alliance's petition to intervene in DPU No. 12-30 identified Ms. Taylor "as a petitioner and Alliance supporter on whose behalf the Alliance sought to intervene." State Mem. 11 n.14.  But, as noted above, Ms. Taylor was denied status as an intervenor.  Ruling on Petitions to Intervene 12.

In *Burford*, the plaintiff claimed that the Texas Railroad Commission violated the federal Due Process Clause by ignoring state law precedents.  *See Burford*, 319 U.S. at 331 & n.28.  The "constitutional challenge was of minimal federal importance" because it "involv[ed] solely the question whether the commission had properly applied Texas' complex oil and gas conservation regulations."  *NOPSI*, 491 U.S. at 360.  The Court abstained because the case turned primarily on "the intricacy and importance of the [state] regulatory scheme," *NOPSI*, 491 U.S. at 360, and a federal court decision risked a "dangerous" conflict in the interpretation of state law, *Burford*, 319 U.S. at 334.

By contrast, in *NOPSI*, abstention was denied where, as here, the plaintiffs claimed that a state ratemaking body had encroached on the field occupied by the Federal Power Act.  *NOPSI*, 491 U.S. at 353-58.  The Court reasoned:

> NOPSI's primary claim is that the [state ratemaking body] is prohibited by federal law from refusing to provide reimbursement for FERC-allocated wholesale costs. Unlike a claim that a state agency has misapplied its lawful authority or has failed to take into consideration or properly weigh relevant state-law factors, federal adjudication of this sort of pre-emption claim would not disrupt the State's attempt to ensure uniformity in the treatment of an essentially local problem.

*Id.* at 361-62 (internal quotation marks omitted).

This case is like *NOPSI*, not *Burford*.  Like *NOPSI*, this case "does not involve a state-law claim, nor even an assertion that the federal claims are in any way entangled in a skein of state-law that must be untangled before the federal case can proceed."  *NOPSI*, at 491 U.S. at 361 (quotation marks omitted).  Nor do Plaintiffs contend that "a state agency has misapplied its lawful authority or has failed to take into consideration or properly weigh relevant state law claims."  *Id.* at 362.  Instead, Plaintiffs allege two purely federal claims.  Plaintiffs' preemption claim is virtually the same as the claim raised in *NOPSI*, and Plaintiffs' dormant Commerce Clause claim is the type of claim routinely litigated in federal courts and is entirely unrelated to

14

the state's administrative scheme.  *See, e.g.*, *Trailer Marine Transport Corp. v. Rivera-Vazquez*, 931 F.2d 961, 964 (1st Cir. 1991).  Under *NOPSI*, therefore, *Burford* abstention is inappropriate.

State Defendants attempt to distinguish *NOPSI* on the ground that it involved a preemption challenge that interfered with an existing FERC order, whereas FERC has purportedly "recognized that there is nothing problematic" about the DPU's actions here.  State Mem. 17 n.15.  But that is an argument on the merits of preemption (which we address *infra* pp. 41-42), not a ground for abstention.  The First Circuit, moreover, has refused to limit *NOPSI* to its facts, explaining that *NOPSI* "cabins the operation of the *Burford* doctrine" so that courts should abstain "only in the narrowly circumscribed situations where deference to a state's administrative processes for the determination of complex, policy-laden, *state-law issues* would serve a significant local interest and would render federal court review inappropriate."  *Fragoso v. Lopez*, 991 F.2d 878, 882 (1st Cir. 1993) (emphasis added); *see also Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 524 (1st Cir. 2009) (declining to apply *Burford* abstention when plaintiff's claim did not require court to resolve any questions of state law); *Pub. Serv. Co. of N.H. v. Patch*, 221 F.3d 198, 203 (1st Cir. 2000) (same); *Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd.*, 633 F.3d 20, 31-34 (1st Cir. 2011) (same); *Sevigny v. Employers Ins. of Wausau*, 411 F.3d 24, 29 (1st Cir. 2005) (rejecting *Burford* even though predominant issues involved state law).[13]  Defendants' attempt to distinguish *NOPSI* fails.  Because Plaintiffs'

---

[13] Defendants cite only one First Circuit case that granted *Burford* abstention:  *Allstate Ins. Co. v. Sabbagh*, 603 F.2d 228 (1st Cir. 1979).  Even assuming *Allstate* remains good law after *NOPSI*, it merely illustrates why *Burford* should not apply here.  The sole federal issue in *Allstate* was a due process claim that insurance rates set by a state agency were confiscatory; a parallel state-law claim was raised as well.  *Id.* at 229-30, 233.  Like the due process claim in *Burford*, the case had "minimal federal importance" and primarily turned on state-law issues.  *NOPSI*, 491 U.S. at 360.  Here, Plaintiffs' preemption and dormant Commerce Clause claims implicate profound federal interests and involve virtually no state-law issues.

claims implicate strong federal interests and raise minimal questions of state policy, *Burford* abstention should be denied.

## III.     Issue Preclusion Does Not Apply.

State Defendants next contend that issue preclusion bars the claims of three of the seven Plaintiffs:  the Town of Barnstable, Sandra Taylor, and the Alliance.  State Mem. 19-21.  Even if that were correct, it would not bar the claims of the remaining Plaintiffs.[14]  But issue preclusion does not bar any Plaintiff.

As the U.S. Supreme Court has emphasized:  "[A] person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit.  The application of claim and issue preclusion to nonparties thus runs up against the 'deeprooted historic tradition that everyone should have his own day in court.'"  *Taylor v. Sturgell*, 553 U.S. 880, 893-94 (2008) (quoting *Richards v. Jefferson Cnty.*, 517 U.S. 793, 798 (1996)).  That principle, moreover, is rooted in constitutional due process.  *Richards*, 517 U.S. at 797 & n.4.  The Supreme Court has squarely rejected any notion that a party can be precluded merely "based on identity of interests and some kind of relationship between parties and nonparties."  *Taylor*, 553 U.S. at 901.

Under Massachusetts law, which governs Defendants' preclusion claims, Defendants must show that "the party against whom [issue preclusion] is asserted [was] a party (or in privity with a party) to the prior adjudication."  *Alba v. Raytheon Co.*, 809 N.E.2d 516, 521 (Mass. 2004).  The fact that two parties "share[] an interest in proving or disproving some of the same facts does not establish that privity existed."  *Bourque v. Cape Southport Assocs., LLC*, 800 N.E.2d 1077, 1081-82 (Mass. Ct. App. 2004).  Rather, the privity element requires Defendants to

---

[14] Defendants suggest that they may argue preclusion with respect to the remaining Plaintiffs at a later stage.  State Mem. 19 n.17.  We will respond to that argument when it is made.

show that one party "exercised substantial control" over the other.  *Id.* (internal quotation marks omitted).

*Town of Barnstable*.  In arguing that the Town of Barnstable is precluded, Defendants rely solely on the fact that the Alliance mentioned the Town as a party seeking to intervene in a *different* proceeding, DPU 12-19.  State Mem. 10 n.11.  The Town of Barnstable did not participate in DPU 12-30, nor do Defendants claim that the Town was in privity with the Alliance or any other participant in DPU 12-30.  The Alliance's reference to the Town in a different DPU proceeding[15] cannot give rise to preclusion based on a factual finding made by the DPU in Order 12-30.  Nor do Defendants point to any facts demonstrating that the Town of Barnstable exercised control over the Alliance, or vice-versa, in that proceeding.

*Ms. Taylor.*  Ms. Taylor sought to intervene in DPU 12-30, but that motion was denied. She therefore did not participate in DPU 12-30.  Nor did the Alliance (or any other party) appeal Order 12-30 on Ms. Taylor's behalf, and Defendants make no attempt to show the "substantial control" required for privity.  *Bourque*, 800 N.E.2d at 1081.  Ms. Taylor therefore cannot by precluded by DPU Order 12-30.

*The Alliance.*  The Alliance did participate in DPU 12-30, but preclusion is nevertheless inapplicable.  Preclusion applies only where "the issue decided in the prior adjudication [was] identical with the one presented in the action in question" and "the issue decided in the prior adjudication [was] essential to the judgment."  *Alba*, 809 N.E.2d at 521.  Neither condition is met here.

---

[15] Defendants' reliance on this filing made in a different proceeding not only is irrelevant, but also draws an adverse inference that is inappropriate for a motion to dismiss.  Factual development would show that, notwithstanding the Alliance's reference to the Town of Barnstable, the Alliance was not acting for the Town in that other DPU proceeding.  Even if the Court were inclined to view the filing as relevant – which it is not – the Town must be afforded the opportunity to make a factual record regarding its non-involvement in that DPU proceeding.

First, the issues decided in DPU 12-30 are not identical to the ones presented here.  In Order 12-30, the DPU found (unsurprisingly) that "NSTAR Electric was not required to enter into the [contract with Cape Wind]."  DPU Order 12-30, at 34.  Plaintiffs' preemption claim, however, does not depend on whether NSTAR's *entry* into the Cape Wind contract was voluntary.  Plaintiffs additionally allege that – regardless of NSTAR's reasons for *entering* the contract – the state regulators dictated the *price* of the NSTAR–Cape Wind contract, as opposed to allowing that price to emerge freely from negotiations between the parties.  Compl. ¶¶ 77, 82-83, 106-07.  Thus, even if NSTAR voluntarily entered into the Cape Wind contract, as the DPU purportedly found,[16] the state intruded into the exclusive federal field when it dictated the price of that contract.  *Id.* ¶¶ 106-108.[17]  The DPU made no factual finding about that basis for Plaintiffs' preemption claim.  Nor did the DPU address Plaintiffs' dormant Commerce Clause claim.  Thus, the issues in DPU 12-30 are not "identical" to those here for preclusion purposes.  *Alba*, 809 N.E.2d at 521.

Second, the DPU's finding that NSTAR's was not required to enter the Cape Wind contract was not "essential to the judgment" in DPU 12-30.  *Id.*  Immediately after making that finding, the DPU reasoned that "nothing in [state law] suggests that the [DPU] should inquire into a company's motives . . . in entering into a contract, which would be difficult if not

---

[16] The remaining Plaintiffs, who were not parties to DPU 12-30, are in no way bound by the DPU's factual findings and remain free to argue that NSTAR's entry into the contract was not voluntary.

[17] For example, when a company hires an employee and is forced to pay the minimum wage, the company is not required to enter into the labor contract, but the state nonetheless dictates the rate at which the employee will be compensated for his labor.  Likewise here, even if the Commonwealth did not force NSTAR to *enter* into the Cape Wind contract, it nevertheless established the rate to be paid by NSTAR.  And when a state sets a wholesale electricity rate for a favored in-state generator, it encroaches on the field occupied by the FPA; when that rate is also above-market, it discriminates against interstate commerce in violation of the dormant Commerce Clause.

impossible to do in any event." *Id.*  Thus, the DPU held that whether NSTAR entered into the

Cape Wind contract voluntarily was *irrelevant* to the DPU's decision in Order 12-30.  As a

result, the DPU's voluntariness finding was dicta (or, at most, an alternative ground for decision)

and thus cannot result in issue preclusion.  *See Jarosz v. Palmer*, 766 N.E.2d 482, 489 (Mass.

2002) ("For a ruling to have preclusive effect, it must have a bearing on the outcome of the

case."); *id.* (quoting Restatement (Second) of Judgments § 27 comment h (1982)) ("If issues are

determined but the judgment is not dependent upon the determinations, relitigation of those

issues in a subsequent action between the parties is not precluded.").

## IV.     The Complaint Presents a Concrete Controversy.

Notably, NSTAR does not take issue with the merits of Plaintiffs' claims, nor does it

deny Plaintiffs' assertion that state regulators forced NSTAR into the Cape Wind contract and

dictated the contract's rate and terms.  Instead, NSTAR's sole contention – framed in terms of

standing and ripeness – is that there is not yet any concrete controversy between the parties.  The

determination of whether a controversy is sufficiently concrete for adjudication "depends on two

factors: 'the fitness of the issues for judicial decision and the hardship to the parties of

withholding court consideration.'"  *Sindicato Puertorriqueno de Travabadores v. Fortuno*, 699

F.3d 1, 8 (1st Cir. 2012) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

Plaintiffs' allegations must be accepted as true, and all inferences drawn in their favor.  *Hostar*,

592 F.3d at 207.  Here, both components of the test for a concrete controversy are satisfied.

### A.      The Issues in This Case Are Fit for Judicial Decision.

The "basic rationale" of the inquiry into whether issues are fit for decision is "to prevent

the courts, through avoidance of premature adjudication, from entangling themselves in abstract

disagreements."  *Id.*  There is nothing abstract about the disagreement here.  Plaintiffs contend

that DOER illegally coerced NSTAR into contracting with Cape Wind, and that DPU's

concomitant approval of the NSTAR-Cape Wind contract in Order 12-30 violates federal law.

No future events could possibly affect whether Order 12-30 is legal; all of the factual events that

are necessary to determine the legality of Order 12-30 have already occurred.  Thus, "[t]his is not

a situation where a declaration is sought on the legal consequences of a hypothetical act that may

or may not occur in the future."  *Verizon New England, Inc. v. Int'l Bhd. of Elec. Workers, Local

No. 2322*, 651 F.3d 176, 189 (1st Cir. 2011).  Under these circumstances, the First Circuit has

consistently found cases to be fit for judicial decision.  *See, e.g.*, *id.* at 188; *Gastronomical

Workers Union Local 610 v. Dorado Beach Hotel Corp.*, 617 F.3d 54, 61 (1st Cir. 2010) ("This

case is ripe for adjudication. All of the events giving the existence of [liability] are matters of

historical fact."); *Stern v. U.S. Dist. Court for Dist. of Mass.*, 214 F.3d 4, 10 (1st Cir. 2000)

(finding case ripe when "[t]he issue presented can be finally resolved by declaratory judgment,

its contours are sharply defined, and additional facts will not affect its resolution").

NSTAR argues that Plaintiffs' claims are speculative because Cape Wind must still

obtain other regulatory approvals and might never be built.  NSTAR Mem. 8 n.4, 9.  Notably,

neither Cape Wind nor State Defendants appear to share NSTAR's doubt that Cape Wind will be

built.  In any event, Plaintiffs are challenging the actions that state regulators took in forcing

NSTAR into the Cape Wind contract and permitting NSTAR to pass on the costs of that contract

to Plaintiffs.  Each of those actions – including the DPU's passage of Order 12-30 – has already

occurred.  As for the fact that Cape Wind must obtain other regulatory approvals, the First

Circuit has held that a controversy is sufficiently concrete for decision in virtually identical

circumstances:

> Plaintiffs' alleged injury is the BIA's failure to follow federal law before
> approving the lease. The dispute before us is not over the hypothetical

> construction and operation of an LNG terminal, but the allegedly improper
> approval of the lease that is the prerequisite to the terminal.  While the
> construction of the terminal is hypothetical and uncertain at this juncture, the
> approval of the lease is complete.  The BIA has made its decision.

*Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 33 (1st Cir. 2007); *accord KG Urban*

*Enters., LLC v. Patrick*, 693 F.3d 1, 16 (1st Cir. 2012) ("The fact that the case could be rendered

moot – for example, if the state Commission determines that land will not be taken into trust –

does not render the case unripe."); *Riva v. Massachusetts*, 61 F.3d 1003, 1011 (1st Cir. 1995) ("A

litigant seeking shelter behind a ripeness defense must demonstrate more than a theoretical

possibility that harm may be averted.").  The same is true here:  The contract has been signed and

approved by the DPU, and even if the construction of Cape Wind is somewhat "uncertain at this

juncture," that does not render this action unripe.  *Nulankeyutmonen*, 503 F.3d at 33.

 NSTAR also points out that the exact rate that NSTAR must pay Cape Wind may be

adjusted in the future based on certain contingencies, such as Cape Wind's qualifications for tax

credits.  NSTAR Mem. 8.  As a result, NSTAR contends that "it is quite simply impossible to tell

whether the plaintiffs' NSTAR bills in 2016 and beyond are 'above-market' until that time."  *Id.*

at 9.  But these contentions are irrelevant to standing and ripeness, because Plaintiffs' injury is

not based on the difference between NSTAR's rates in 2016 and market rates in 2016.  Rather, it

is based on the difference between the deal NSTAR *did* strike in 2012 and the deal NSTAR

*could have* struck in 2012, either with Cape Wind or with one of Cape Wind's competitors, had

it not been forced into the particular terms of the NSTAR–Cape Wind contract by state

regulators.  Indeed, NSTAR's own estimate was that the Cape Wind contract would cost

Plaintiffs and other ratepayers nearly a billion dollars over the fifteen-year term of the contract in

comparison with what NSTAR could have obtained by entering into a different long-term

contract. Compl. ¶ 93; *see also* Order 12-30, at 183 (noting the "above-market" costs of the contract).

Moreover, because of the state coercion, NSTAR was unable to negotiate the price of the Cape Wind contract – even though power prices had fallen since National Grid had agreed to that price. Compl. ¶¶ 83, 93-94. Notably, NSTAR does not argue that it would have agreed to identical rates without DOER's coercion, and contemporaneous statements of NSTAR executives confirmed that NSTAR viewed Cape Wind's power as over-priced. Compl. ¶¶ 56, 88. The DPU, moreover, expressly acknowledged in Order 12-30 that Cape Wind was charging above-market prices. Compl. ¶¶ 91, 93-96; Order 12-30, at 183. Indeed, a recent competitive bidding process for renewable electricity resulted in prices only about 40% the amount charged by Cape Wind and compelled by the state. Compl. ¶ 95.

**B.      Withholding Court Consideration Will Work a Hardship to the Parties.**

This case also presents a concrete controversy because delaying judicial review will cause prejudice to the parties. *Sindicato*, 699 F.3d at 8. When applying the hardship factor, "[r]ather than asking, negatively, whether denying relief would impose hardship, courts will do well to ask, in a more positive vein, whether granting relief would serve a useful purpose, or, put another way, whether the sought-after declaration would be of practical assistance in setting the underlying controversy to rest." *Verizon New England, Inc.*, 651 F.3d at 188 (quotation marks omitted).

Here, adjudicating this case immediately would serve the useful purpose of allowing the parties to know whether Cape Wind can charge its above-market rates *before* Cape Wind is constructed. Indeed, Cape Wind, far from arguing that the case is unripe and should be filed later, instead seeks expedited review. If Cape Wind is constructed, and this Court *then* enters an order enjoining the Cape Wind-NSTAR contract, such an order would impose considerable

hardship:  Cape Wind would face the significant day-to-day costs associated with maintaining a

wind generator, but would be unable to sell *any* power to NSTAR unless NSTAR voluntarily

signed a new contract.  And even if NSTAR did sign a new contract, it might be at a price too

low for Cape Wind to make a profit – particularly because the Green Communities Act now

requires competitive bidding.  2012 Mass. Acts ch. 209 § 35, 36.  It would be far more

convenient for this Court to resolve this dispute before Cape Wind is built.  *Riva*, 61 F.3d at 1010

(delaying adjudication would cause hardship when "a party must decide currently whether to

expend substantial resources that would be largely or entirely wasted if the issue were later

resolved in an unfavorable way").

In its brief discussion of the hardship prong, NSTAR contends that Plaintiffs' injuries are

"contingent" and that the Court should wait and see whether "the market ultimately determines

that the rate paid by NSTAR to Cape Wind beginning in 2016 is above-market."  NSTAR Mem.

10-11.  This contention is identical to NSTAR's contention regarding the "fitness" prong, and as

explained above, it fundamentally misunderstands Plaintiffs' claims.  Plaintiffs allege an

immediate injury, which should be immediately resolved by this Court.  *See supra* pp. 19-22.

## V.      Plaintiffs' Claims Stem from State Action.

Both State Defendants and Cape Wind contend that Plaintiffs have failed to allege any

state action.  They argue that although DOER was tasked with implementing the Governor's

clean energy initiatives, it was nonetheless acting as something other than a state actor when it

threatened to hold up NSTAR's merger unless NSTAR agreed to purchase power from Cape

Wind at the price and on the terms set forth in the Settlement Agreement.  State Mem. 26; Cape

Wind Mem. 20.  They further argue that, even if DOER's actions were improper, that should not

matter, because the contract could not go into effect until it was approved by the DPU, a separate

state agency.  Cape Wind Mem. 18.  In their view, DPU's approval acts as a kind of intervening cause that launders any illegality by DOER.  *Id.*

These arguments should be rejected.  The Court must, at the motion-to-dismiss stage, accept as true the well-pleaded factual allegations in the Complaint and draw all inferences in Plaintiffs' favor.  *See Hostar*, 592 F.3d at 207.  Here, the factual allegations, taken as true, support the inference that DOER leveraged its role as the Commonwealth's agency in charge of energy and environmental policy to force NSTAR into the contract with Cape Wind, at a price and on terms dictated by DOER.  *See* Compl. ¶¶ 64-89, 92, 106-08.  And the allegations further support the inference that the DPU's approval of that contract – which the DPU understood was a condition precedent to the contract's effectiveness – ratified and propagated DOER's illegal conduct.  *Id.* ¶¶ 84-92, 94-97.  The Defendants may seek to contest these points as a matter of fact later in the proceedings, but for purposes of evaluating the motion to dismiss, the Court must accept these allegations as true and draw all inferences in Plaintiffs' favor.

## A.    DOER's Coercive Pressure Was State Action.

State Defendants and Cape Wind contend that Plaintiffs may not challenge DOER's exercise of coercion over NSTAR because DOER did not engage in state action.  According to Cape Wind, DOER was acting "solely in its role as party-advocate in a contested adjudicatory proceeding," rather than as a state actor.  Cape Wind Mem. 20; *see also* State Mem. 26.

This contention fails.  DOER is an arm of the Commonwealth of Massachusetts; DOER officials are invoking the Commonwealth's sovereign immunity and are being represented by the Commonwealth's attorneys in this very lawsuit.  The mere fact that DOER was a party to the DPU proceedings does not preclude it from being a state actor; if it did, then a prosecutor would be considered a non-state actor merely because the prosecutor is a litigant in court, which is clearly wrong.  *See Georgia v. McCollum*, 505 U.S. 42, 50 (1992) (noting that a prosecutor is "a

24

quintessential state actor").  Indeed, in Order 12-30, the DPU specifically relied on DOER's

sovereign status as its basis for approving DOER's involvement in developing the NSTAR–Cape

Wind Memorandum of Understanding ("MOU")[18] that became the basis for the power contract

approved by the DPU.  The DPU explained:

> DOER is an executive agency with substantial responsibility for establishing and implementing the Commonwealth's energy policies pursuant to G.L. c. 25A, § 6, and with various statutory obligations with respect to implementation of the Green Communities Act. . . .  With respect to Section 83 specifically, DOER is charged with consulting with the Commonwealth's electric distribution companies regarding their choice of contracting and solicitation methods for long-term contracts.  In light of DOER's role in developing energy policy in the Commonwealth and its specific responsibilities with respect to Section 83 contracts, the Department finds that DOER's involvement as a party to the settlement agreement in D.P.U. 10-170 and the development of the NSTAR Electric-Cape Wind MOU was appropriate and in no way invalidates the PPA.

Order 12-30, at 37-38.  Although Plaintiffs disagree that DOER's involvement was

"appropriate," this passage should leave no doubt that DOER was exercising sovereign authority

in compelling NSTAR to contract with Cape Wind.[19]

---

[18] The Memorandum of Understanding is Exhibit 7 of State Defendants' Memorandum, ECF No. 38-7.

[19] State Defendants and Cape Wind quote an out-of-context statement from the Alliance suggesting that the DOER was not acting in its sovereign capacity.  State Mem. 26; Cape Wind Mem. 20.  But Defendants do not argue estoppel, and they could not.  The Alliance filed those comments in a different DPU proceeding than the proceeding that led to Order 12-30, and in the entirely different context of arguing that the Settlement Agreement violated the Sherman Act.  Comments of the Alliance to Protect Nantucket Sound and Its Individual Supporters, DPU 12-19, at 9-10, Ex. 4 to State Mem.  Moreover, in those very same comments, the Alliance argued that "DOER's insistence on a Cape Wind Mandate in its Settlement Agreement with NSTAR Electric created an unconstitutional regime that violates the Commerce Clause."  *Id.* at 6.  Thus, the Alliance has always taken the position that DOER engages in state action, because only state actors can "creat[e] an unconstitutional regime that violates the Commerce Clause." *Id.*

**B.     The DPU's Approval of the Contract Propagated and Ratified DOER's Illegal Conduct.**

State Defendants and Cape Wind also contend that DOER's exercise of coercion did not cause any harm because the DPU was the state agency that ultimately approved the merger. *See* State Mem. 26 ("DOER had no legal authority to reject or approve the merger . . . . [O]nly DPU had such authority."); Cape Wind Mem. 18-19 (arguing that DOER could not have caused harm because the DPU, not DOER, approval the contract). But Plaintiffs are not contending that *DOER* is causing a continuing violation of federal law. Plaintiffs contend that the *DPU*, through Order 12-30, is engaging in a continuing violation of federal law, because that Order ratifies a power contract, on a prospective basis, that was illegally coerced by DOER.

State Defendants and Cape Wind, however, appear to argue that DOER could not possibly have coerced NSTAR into contracting with Cape Wind, because DOER did not have any leverage. Their theory appears to be that because DPU (and not DOER) was the entity ultimately responsible for approving the merger, DPU (and not DOER) was the only agency with the power to impose conditions on that approval. *See* State Mem. 26; Cape Wind Mem. 18-19. But as Plaintiffs alleged in the Complaint, DOER conditioned its *support* of the merger on NSTAR's agreement to contract with Cape Wind. Compl. ¶¶ 75, 78, 106-107. Thus, DOER agreed to take the position that "the merger . . . is consistent with the public interest" *only because* NSTAR agreed to buy power from Cape Wind. *Id.* ¶ 78. It stands to reason that DOER's support of the merger was a powerful bargaining chip that allowed DOER to exercise significant leverage over NSTAR. DOER is the agency in charge of implementing the Commonwealth's energy policy and has a legal right to participate in DPU proceedings. Indeed, DOER was even able to persuade DPU to change the standard of review applicable to mergers.

*Id.* ¶ 66.  At a minimum, the determination of whether DOER had leverage to exercise coercive power over NSTAR is a factual question inappropriate for resolution in a Motion to Dismiss.

The argument of State Defendants and Cape Wind appears to reduce to the following reasoning:  Because DOER coerced NSTAR to sign the contract (but did not ultimately approve it), and because DPU approved the contract (but did not coerce NSTAR into signing it), *no one* from the state could have violated federal law.  Thus, under their view, if a state apportions responsibility for violating federal law to multiple state actors, *all* of the state actors can shield themselves from federal jurisdiction.  But this argument cannot possibly be correct.  It is well-accepted that an organizational defendant cannot evade legal liability simply by apportioning responsibility among multiple decision-makers and then claiming that no one decision-maker is responsible for every act that led to liability.  *See, e.g.*, *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1191-93 (2011) (organizational defendant cannot evade liability by apportioning responsibility among multiple agents); *United States v. Bank of New England, N.A.*, 821 F.2d 844, 856 (1st Cir. 1987) (knowledge of multiple corporate agents must be aggregated to establish corporation's responsibility).  Indeed, the argument of State Defendants and Cape Wind would lead to the absurd outcome that a prosecutor's action could *never* violate federal law, because the prosecutor is a litigator and not the agent that is ultimately responsibility for imposing a criminal sentence.  That is clearly wrong.  If a prosecutor coerces a defendant into agreeing to a plea bargain or imposes an illegal condition on his recommendation of a lower sentence, then the conviction is illegal even if the plea or recommendation is ultimately accepted by a judge:  the criminal defendant can challenge the conviction or sentence on the ground that it propagated the effect of the prosecutor's illegal actions.

Moreover, the DPU's approval of the contract was hardly independent of DOER's involvement in dictating the terms of the contract.  The DPU issued an Order approving the MOU, *see* DPU Order 12-19, Ex. 8 to State Mem. (approving MOU), and the Settlement Agreement expressly made the DPU's approval of the anticipated Cape Wind contract a condition of the contract's effectiveness, *see* Settlement Agreement ¶ 2.2.4, Ex. 5 to State Mem.; *see also* MOU ¶ 3, Ex. 7 to State Mem. (stating that the parties agree that the power contract would be submitted to the DPU for approval).  Accordingly, Plaintiffs can challenge DPU Order 12-30 on the ground that it propagates the effects of DOER's illegal coercion of the PPA.[20]

## VI.   There Are No Grounds to Dismiss the Preemption Claim.

### A.   Both Section 1983 and the Supremacy Clause Itself Provide a Cause of Action.

Under well-established Supreme Court and First Circuit precedent, Plaintiffs may bring their preemption claim under 42 U.S.C. § 1983 and directly under the Supremacy Clause.  Cape Wind's contention that Plaintiffs lack a cause of action, Cape Wind Mem. 9-13, fundamentally misunderstands Plaintiffs' claims and the governing legal framework.

It is well-established that a plaintiff may bring suit against state officials contending that state action is preempted by a federal statute.  For instance, in *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983), the plaintiff, Delta, brought a preemption claim against state officials.  *Id.* at 92. The Supreme Court held that it had jurisdiction to hear the claim:  "A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a

---

[20] State Defendants' remaining arguments regarding DOER's liability lack merit.  State Defendants contend that Plaintiffs "have already litigated" the issues presented in this lawsuit, State Mem. 26, but that is simply a rehash of the issue preclusion argument that Plaintiffs have addressed above.  *Supra* pp. 16-19.  State Defendants also argue that "FERC retains the authority to consider and approve or reject Cape Wind's wholesale electricity rates," *id.*, but as Plaintiffs argued below, FERC's authority is a non-sequitur in this case.  *Infra* pp. 41-42.

federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." *Id.* at 96 n.14.  The Court then partially ruled for Delta on the merits, holding that a portion of New York's statute was preempted.  *Id.* at 108-09.  Since *Shaw*, the Supreme Court has routinely ruled in favor of plaintiffs' preemption challenges to state action, without even hinting that plaintiffs might lack a cause of action.  *See, e.g.*, *Am. Trucking Ass'ns., Inc. v. City of L.A.*, 133 S. Ct. 2096 (2013); *Wos v. E.M.A. ex rel. Johnson*, 133 S. Ct. 1391 (2013); *Nat'l Meat Ass'n v. Harris*, 132 S. Ct. 965 (2012); *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364 (2008).  Indeed, in *NOPSI*, the Supreme Court held that a federal court should not abstain from hearing a preemption lawsuit under the Federal Power Act – the same statute that Plaintiffs invoke here. 491 U.S. at 359.

Likewise, the First Circuit has held that "in suits against state officials for declaratory and injunctive relief, a plaintiff may invoke the jurisdiction of the federal courts by asserting a claim of preemption, even absent an explicit statutory cause of action."  *Local Union No. 12004, United Steelworkers of America v. Massachusetts*, 377 F.3d 64, 75 (1st Cir. 2004).  Quoting a leading treatise, the First Circuit stated that "[w]hile there may be some lack of harmony in the case law, the rule that there is an implied right of action to enjoin state or local regulation that is preempted by a federal statutory or constitutional provision – and that such an action falls within the federal question jurisdiction – is well-established."  *Id.* at 75 n.8 (quoting Fallon, Meltzer & Shapiro, *Hart & Wechsler's The Federal Courts & The Federal System* 903 (5th ed. 2003)); *see also Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 73 (1st Cir. 2001) ("'[A] state or territorial law can be unenforceable as preempted by federal law even when the federal law secures no individual substantive rights for the party arguing preemption.'" (quoting *St. Thomas–*

*St. John Hotel & Tourism Ass'n v. Virgin Islands*, 218 F.3d 232, 241 (3d Cir. 2000))), *aff'd*, 538

U.S. 644 (2003); *P.R. Tel. Co. v. Municipality of Guayanilla*, 450 F.3d 9, 15 (1st Cir. 2006) ("A

party may bring a claim under the Supremacy Clause that a local enactment is preempted even if

the federal law at issue does not create a private right of action." (quoting *Qwest Corp. v. City of

Santa Fe*, 380 F.3d 1258, 1266 (10th Cir.2004))).   This authority is dispositive and establishes

that Plaintiffs' preemption claim may proceed.[21]

Cape Wind's contrary arguments lack merit.   First, Cape Wind cites a dissenting opinion

arguing in favor of limiting the scope of preemption claims.   Cape Wind Mem. 14-15 (citing

*Douglas v. Indep. Living Ctr. of S. Cal.*, 132 S. Ct. 1204, 1213 (2012) (Roberts, C.J.,

dissenting)).   But neither the Supreme Court nor the First Circuit has ever adopted the dissenters'

view of the law in *Douglas*.   As a court within this Circuit recently explained:

> In this circuit, applicable precedent generally supports plaintiffs' claim of right to
> a cause of action challenging the validity of state laws under the Supremacy
> Clause on grounds that they conflict with federal law and undermine important
> federal interests.   So, while the differing views expressed in *Douglas* concededly
> add up to serious doubt about the future viability of private suits like this one, the
> law remains unchanged by *Douglas.* This court is obliged to rule in a manner
> consistent with applicable circuit and Supreme Court precedent and cannot ignore
> that precedent in anticipation of future change.

*Dartmouth-Hitchcock Clinic v. Toumpas*, No. 11-cv-358-SM, 2012 WL 4482857, at *3 (D.N.H.

Sept. 27, 2012) (internal quotation marks omitted).   Under current Supreme Court and First

Circuit case law, Plaintiffs may bring their preemption cause of action.

Moreover, even if the dissenters' view in *Douglas* had prevailed, this case would be

readily distinguishable.   In *Douglas*, the plaintiffs were, in effect, suing for money damages.

---

[21] Cape Wind contends that "Plaintiffs bring both their actions pursuant to 42 U.S.C. § 1983."
Cape Wind Mem. 13.   That is incorrect.   Plaintiffs' claim is alternatively brought directly under
the Supremacy Clause and under 42 U.S.C. § 1983.   *See* Compl. p. 31 (claim is brought for
"violation of Supremacy Clause *and* 42 U.S.C. § 1983" (emphasis added; capitalization altered)).

Although they were nominally seeking an injunction, the plaintiffs' allegation was that certain rate reductions were preempted by the Medicaid Act, and they sought an injunction that would halt those rate reductions and ensure greater compensation.  *Douglas v. Indep. Living Ctr. Of S. Cal.*, 132 S. Ct. 1204, 1209-10 (2012).  Here, Plaintiffs are not seeking money damages, either explicitly or implicitly; they are seeking to enjoin an illegal order, a type of injunction routinely sought in federal court.  *See, e.g.*, *Wos*, 133 S. Ct. at 1395-96 (post-*Douglas* case ruling in favor of plaintiffs' suit alleging that state statute was preempted by Medicaid Act).

Finally, Cape Wind offers the irrelevant argument that there is no federal cause of action for a just and reasonable rate.  Cape Wind Mem. 15-16.  But Plaintiffs are not suing for a "general right to a reasonable rate*." Id.* at 15.  Plaintiffs do not ask this Court to make any determination about what a reasonable rate might be.  Rather, Plaintiffs seek only to enjoin state officials from enforcing DPU Order 12-30, which ratified and approved the state's illegal wholesale rate-setting, and which entitles NSTAR to charge Plaintiffs and other ratepayers for those illegal wholesale rates.  As discussed further below, *see infra* pp. 41-42, the state may not intrude into the field of wholesale rate-setting, regardless of whether the rate that it sets is deemed by FERC to be just and reasonable.[22]

---

[22] In a lengthy footnote, Cape Wind offers two other arguments against Plaintiffs' preemption claim.  Cape Wind Mem. 13 n.15.  Both are unsuccessful.  First, Cape Wind argues that Plaintiffs may not challenge a "contract between the state and a private company."  But Plaintiffs do not challenge a *contract*; Plaintiffs challenge a *DPU Order*, which is undoubtedly state action. Cape Wind also appears to suggest that a plaintiff may not bring a preemption claim unless it challenges "state statute[s] or regulations," *id.*, but this contention is obviously incorrect.  *See, e.g.*, *Am. Trucking Ass'ns., Inc.*, 133 S. Ct. at 2099 (entertaining preemption challenge to "concession agreement" between city and trucking companies).  Second, Cape Wind contends that a preemption claim may be raised only as a defense in a state enforcement proceeding, or preemptively against a threat of an enforcement proceeding.  This is an exact replica of the argument made in the Chief Justice's dissent in *Douglas*.  132 S. Ct. at 1213 (Roberts, C.J., dissenting).  But as noted above, the Chief Justice's dissent did not command a majority of the Court, and does not reflect current case law.  *See, e.g.*, *KG Urban Enterprises, LLC v. Patrick*,

**B.      The Allegations in the Complaint Establish a Clear Violation of the Supremacy Clause.**

     **1.      The Federal Power Act Occupies the Field of Wholesale Electricity Sales and Preempts Any State Action in That Field.**

It is a "fundamental principle of the Constitution . . . that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  That power arises by "direct operation of the Supremacy Clause." *Brown v. Hotel & Rest. & Bartenders Emps. Int'l Union Local 54*, 468 U.S. 491, 501 (1984); *see* U.S. Const., art. VI, cl. 2 (the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding").

"When Congress intends federal law to 'occupy the field,'" federal law preempts state law "[e]ven without an express provision for preemption." *Crosby*, 530 U.S. at 372; *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).  A congressional intent to occupy a field can be inferred when "[t]he scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or when "the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

In the Federal Power Act, Congress occupied the field of wholesale electricity sales, including the price at which electricity is sold at wholesale, and the terms and conditions under

---

839 F. Supp. 2d 388, 400 (D. Mass. 2012) (addressing merits of plaintiff's claim that state's decision to license casinos was preempted, despite absence of any state enforcement action against plaintiff), *aff'd in relevant part, vacated in part*, 693 F.3d 27-28 (1st Cir. 2012).

which such electricity is sold.  Thus, the FPA specifically provides that FERC will regulate

wholesale sales of electricity:

> The provisions of this subchapter [which establish FERC's jurisdiction] shall
> apply to the transmission of electric energy in interstate commerce and to the sale
> of electric energy at wholesale in interstate commerce . . . .

16 U.S.C. § 824(b)(1) (emphasis added).  The FPA defines a "sale of electric energy at

wholesale" as a "sale . . . for resale."  *Id.* § 824(d).  Thus, FERC has exclusive jurisdiction to

regulate any sale of electricity other than the final "retail" sale made to the factories, homes, and

businesses that consume electricity.

Under the FPA, FERC's authority to regulate wholesale sales of electric energy includes

the power to establish "just and reasonable" wholesale rates.  *Id.* § 824e. The statute defines the

scope of that authority to include:

> All rates and charges made, demanded, or received by [an electric generator] for
> or in connection with the transmission or sale of electric energy subject to the
> jurisdiction of the Commission, and all rules and regulations affecting or
> pertaining to such rates or charges . . . .

16 U.S.C. § 824d(a).

Courts have repeatedly held that the FPA gives FERC *exclusive* authority to regulate

wholesale electricity sales and to establish the prices and terms at which such sales take place.

As Justice Scalia has explained:  "It is common ground that if FERC has jurisdiction over a

subject, the States cannot have jurisdiction over the same subject."  *Miss. Power & Light Co. v.

Miss. ex rel. Moore*, 487 U.S. 354, 377 (1988) (Scalia, J., concurring in the judgment).

Accordingly, the Supreme Court has held that the FPA left "no power in the states to regulate . . .

sales for resale in interstate commerce."  *FPC v. S. Cal. Edison Co.*, 376 U.S. 205, 215 (1964)

(quotation marks omitted); *New England Power Co. v. New Hampshire*, 455 U.S. 331, 340

(1982) (FPA "delegated to [FERC] exclusive authority to regulate the transmission and sale at

33

wholesale of electric energy in interstate commerce, without regard to the source of production"); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953,956 (1986) ("FERC . . . has exclusive jurisdiction over interstate wholesale power rates"); *Penn. Water & Power Co. v. FPC*, 193 F.2d 230, 239 (D.C. Cir. 1951) (through the FPA, Congress has "occupied the field with regard to interstate wholesale rates of electric companies."), *aff'd*, 343 U.S. 414 (1952); *Transmission Access Study Policy Grp. v. FERC*, 225 F.3d 667, 723 (D.C. Cir. 2000) (noting "FERC's exclusive jurisdiction over all aspects of wholesale sales").[23]

Applying those precedents, two recent cases have struck down attempts by states to set wholesale electricity rates.  In *PPL Energyplus, LLC v. Nazarian*, No. MJG-12-1286, __ F. Supp. 2d __, 2013 WL 5432346 (D. Md. Sept. 30, 2013), and *PPL Energyplus, LLC v. Hanna*, No. 11-745, __ F. Supp. 2d __, 2013 WL 5603896 (D.N.J. Oct. 11, 2013), courts invalidated attempts by New Jersey and Maryland, respectively, to establish wholesale electricity rates paid by state utilities to generators.  Both cases confirmed that when states encroach upon FERC's exclusive authority to regulate wholesale sales, the state action is preempted by the FPA and must be enjoined.  *See Nazarian*, 2013 WL 5432346, at *31 (striking down a state commission order as preempted by the FPA because it "establishes the price ultimately received by [a particular generator] for its actual physical [electric] energy and capacity sales"); *Hanna*, 2013 WL

---

[23] The presumption against preemption on which State Defendants rely has no application here, because the field of wholesale electricity sales is not one that the states ever occupied.  *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347–48 (2001) (presumption against preemption is warranted only for "a field which the States have traditionally occupied" (citation omitted)).  In 1927, the Supreme Court held that state regulation in the field of interstate wholesale electricity sales violated the dormant Commerce Clause.  *Pub. Utils. Comm'n of R.I. v. Attleboro Steam & Electric Co.*, 273 U.S. 83, 89-90 (1927).  That ruling created a regulatory "gap," and Congress enacted the Federal Power Act to fill that gap.  *See New York v. FERC*, 535 U.S. 1, 21 (2002).

5603896, at *34-35 (striking down state law that guaranteed a wholesale price to a generator because it "intrudes upon the authority of [FERC] and violates federal law").[24]

State Defendants contend that the FPA is intended to accommodate, rather than preempt, state policy.  To be sure, the FPA left certain regulatory authority to the states, but that authority did not include any power to regulate wholesale sales.  *See Nazarian*, 2013 WL 5432346, at *29-30 (although "the FPA explicitly preserve[d] state jurisdiction over certain areas of the electric energy regulation field . . . [,] [t]he preservation of state authority in a carved-out area within a broader federal regulatory field does not eliminate the exclusive federal jurisdiction over the balance of the field," and "through the FPA Congress vested FERC with authority over wholesale electric energy prices"); *Hanna*, 2013 WL 5603896, at *35 ("Although the State of New Jersey and the Board retained the responsibility for the siting and construction of power plants, they are required to exercise this responsibility without interfering with [FERC's] exclusive authority to regulate wholesale sales of electricity in interstate commerce.").  Thus, the field of wholesale electricity rates is exclusively federal, and "*any* state law falling within [an exclusively federal] field is preempted."  *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984) (emphasis added).  That is so even if the state law is "parallel" or "complementary" to federal regulation, *Arizona v. United States*, 132 S. Ct. 2492, 2501-02 (2012), and even if the federal government has decided not to regulate at all.  *See Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 383-84 (1983).  Here, the FPA grants FERC exclusive authority to

---

[24] Defendants attempt to distinguish these cases, but the cases' key holding – that states may not set wholesale electricity rates – is directly relevant here.  *See Hanna*, 2013 WL 5603896, at *34-35; *Nazarian*, 2013 WL 5432346, at *30-31.  In those cases, Maryland and New Jersey set wholesale rates by fixing the price of a "contract for differences" that they forced utilities to enter.  Here, Massachusetts set wholesale rates by using its leverage over a merger application to compel the utility to enter into a power contract at a particular price and on particular terms. Both means of setting wholesale rates are equally preempted.

regulate "rates and charges made, demanded, or received … for or in connection with" wholesale electricity transactions. 16 U.S.C. § 824d(a).  States are entirely foreclosed from attempting to do so themselves.

> **2.     Massachusetts Encroached on the Field Occupied by the Federal Power Act by Forcing NSTAR to Enter Into a Wholesale Electricity Contract and by Dictating the Contract's Rates and Terms.**

Under the FPA, any wholesale electricity sale made by Cape Wind falls within FERC's exclusive jurisdiction, and any effort by Massachusetts to regulate the rates or terms of a Cape Wind wholesale electricity sale is preempted.  *See Nazarian*, 2013 WL 5432346, at *29-30; *Hanna*, 2013 WL 5603896, at *35; *see also S. Cal. Edison Co.*, 376 U.S. at 215; *New England Power Co.*, 455 U.S. at 340; *Nantahala Power*, 476 U.S. at 956; *supra* pp. 32-36.  Here, Massachusetts encroached on the field occupied by the Federal Power Act when it used its regulatory authority over NSTAR's merger request to force NSTAR to enter into a wholesale contract with Cape Wind and to dictate the rates and terms of that contract.

For example, the allegations in the complaint – which the Court must accept as true for purposes of a motion to dismiss, *see Hostar Marine*, 592 F.3d at 207 – show that NSTAR would not have entered into the NSTAR–Cape Wind contract unless the Patrick Administration had made it a condition of approving NSTAR's requested merger.  *See, e.g.*, Compl. ¶¶ 56-57, 68, 88 ("Following the DPU's approval of the merger, NSTAR Chief Executive May – now Chief Executive of the merged corporation – explained NSTAR's entry into the power contract by citing the 'fear' that Massachusetts regulators might otherwise block the company's planned merger with Northeast Utilities.").  Moreover, the allegations show that NSTAR was not able to freely negotiate the price of the contract.  *See* Compl. ¶ 77 (the Settlement Agreement stipulated that "the terms of the [NSTAR–]Cape Wind Contract, including but not limited to the purchase price for the power . . . , shall be substantially the same as those terms [in the National Grid

contract].”); *id.* ¶ 83 (“NSTAR did not engage in negotiations with Cape Wind over the price of

the power purchase agreement at any time.  Instead, the price was identical to the National Grid

contract, as dictated by the Settlement Agreement between NSTAR and DOER. An NSTAR

executive later testified that “[t]he Settlement Agreement … contemplated that the ‘purchase

price . . . shall be substantially the same as those terms approved by the Department in National

Grid, D.P.U. 10-54 (2010).’”); *id.* (quoting an NSTAR executive as testifying that “we regarded

the terms on pricing as largely negotiated already” and that “pursuant to the terms of the

agreement with DOER, that we were substantially going to comply with what was in there in

terms of price”); *id.* ¶ 85 (“The recitals of the power contract specifically state that the basis for

NSTAR’s entry into the contract is the Settlement Agreement between NSTAR and DOER.”).

Thus, the allegations show that NSTAR was compelled into a particular wholesale power

contract, the rates and terms of which Massachusetts expressly dictated.  *See id.* ¶¶ 68-89.

A Massachusetts statute or order directly requiring NSTAR to enter into the NSTAR–

Cape Wind contract and setting that contract’s rates and terms would unquestionably be

preempted under the FPA.  *See Nazarian*, 2013 WL 5432346, at *35 (striking down state

commission order that “establishes the price ultimately received by [a particular generator] for its

[wholesale electricity] sales”); *Hanna*, 2013 WL 5603896, at *34-35 (striking down state statute

that set a wholesale electricity price); *see also S. Cal. Edison Co.*, 376 U.S. at 215 (the FPA left

“no power in the states to regulate . . . sales for resale in interstate commerce” (quotation marks

omitted)); *New England Power Co.*, 455 U.S. at 340 (same); *Nantahala Power*, 476 U.S. at 956

(same).  The Supremacy Clause does not permit Massachusetts to achieve indirectly, through the

exercise of its regulatory leverage over mergers, what it plainly would be barred from achieving

directly – for “[w]hat a state cannot do directly, it also cannot do indirectly.”  *520 S. Mich. Ave.*

*Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1129 (7th Cir. 2008).  As the Supreme Court has held

with respect to the Natural Gas Act, which is parallel in this relevant respect to the Federal

Power Act, "[t]he federal regulatory scheme leaves no room either for direct state regulation of

the prices of interstate wholesales of natural gas or for state regulations which would indirectly

achieve the same result."  *N. Natural Gas Co. v. State Corp. Comm'n*, 372 U.S. 84, 91 (1963);

*California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 850 & n.17 (9th Cir. 2004) (holding

that California's enforcement of its state unfair competition law was preempted notwithstanding

California's contention that its "application of unfair competition laws merely represents an

*indirect* intrusion into FERC's exclusive authority" (emphasis in original)); *Nantahala*, 476 U.S.

at 966-67 (holding that the state may not use its authority over retail rate-setting to indirectly

regulate wholesale rates); *see also generally N.H. Motor Transp. Ass'n v. Rowe*, 448 F.3d 66, 79

(1st Cir. 2006) (finding preemption and rejecting interpretation of statute that would "permit

states to do indirectly what they cannot do directly"), *aff'd*, 552 U.S. 364 (2008); *New England

Legal Found. v. Mass. Port Auth.*, 883 F.2d 157, 174 (1st Cir. 1989) (finding preemption and

holding that the state "cannot do indirectly what it is forbidden to do directly").

State Defendants and Cape Wind contend that Massachusetts regulators did not, as a

factual matter, force NSTAR to enter into the Cape Wind contract, and that the terms of the

contract were privately negotiated.  *See* State Mem. 21; Cape Wind Mem. 10 n.13.  (Any such

argument is notably absent from NSTAR's motion to dismiss.)  But that argument is based solely

on factual claims at odds with the complaint, including that "NStar and Cape Wind privately

negotiated the contract rate" and that "DOER had no legal authority to reject or approve the

merger."  State Mem. 21, 26.  Such factual arguments are inappropriate for a motion to dismiss.

Defendants may attempt to refute those factual assertions by a motion for summary judgment or

at trial.  But assuming that the allegations in the complaint are true, as required on a motion to

dismiss, *see Hostar Marine*, 592 F.3d at 207, Massachusetts regulators forced NSTAR into a

wholesale electricity contract and dictated the terms of that contract.  As described above, those

actions encroached on the field occupied by the Federal Power Act and were therefore preempted

by federal law.

### C. Defendants' Asserted Grounds for Dismissing the Preemption Claim Are Meritless.

Defendants raise several arguments contending that the preemption claim should be

dismissed on the merits.  Each argument is baseless.

### 1. The State's *Pike County* Authority Does Not Permit It to Force a Utility to Enter Into a Wholesale Contract and Dictate Its Terms.

Defendants assert that the DPU's approval of the NSTAR–Cape Wind contract was

authorized by the state's "*Pike County*" authority to review the "prudence" of a utility's selection

of one among several available wholesale contracts.  *See* State Mem. 24; Cape Wind Mem. 9-11

(describing the DPU Order as a buyer-side regulation).  That is a red herring because Plaintiffs'

preemption claim has nothing to do with the state's *Pike County* authority.

As noted above, under the FPA, states retain authority to regulate the *retail* rates that

utilities charge to end-use customers.  Under the *Pike County* doctrine – named after *Pike County*

*Light & Power Co. v. Pennsylvania Public Utility Commission*, 465 A.2d 735, 737-38 (Pa.

Commw. Ct. 1983) – a state commission may "consider[] whether the purchasing utility chose

wisely among alternative sources of energy supply in entering into the particular agreement."

*Appalachian Power Co. v. Pub. Service Comm'n of W. Va.*, 812 F.2d 898, 903 (4th Cir. 1987);

*see also Kentucky West Virginia Gas Co. v. Penn. Pub. Utility Comm'n*, 837 F.2d 600, 609 (3d

Cir. 1988).  If the commission determines that the utility did not choose wisely, it may deny the

utility the ability to recover the costs of a particular agreement in its rates.

Thus, under *Pike County*, a state is free to deem "prudent" a utility's decision to procure electricity from a relatively expensive source of power (for example, solar power).  But *Pike County* does *not* authorize states to force utilities to enter into particular contracts, or establish the rates and terms under which electricity is procured.  *See Nazarian*, 2013 WL 5432346, at *31; *Hanna*, 2013 WL 5603896, at *34-35; *see also S. Cal. Edison Co.*, 376 U.S. at 215; *New England Power Co.*, 455 U.S. at 340; *Nantahala Power*, 476 U.S. at 956; *cf. Central Vt. Pub. Serv. Corp.*, 84 FERC ¶ 61,194, ¶¶ 61,974-95 (1998) (cited in State Mem. 24) ("[A] state commission is not precluded under the FPA from reviewing the prudence of a wholesale purchase *that was made at [FERC]-approved rates* if the purchaser had other legal choices available." (emphasis added)).[25]

Yet that is precisely what Massachusetts did here.  Massachusetts did not merely determine that the NSTAR–Cape Wind contract was a "prudent" choice among available alternatives.  Rather, as described above, Massachusetts used its regulatory authority to force Cape Wind into a particular contract (the NSTAR–Cape Wind contract) and to dictate its price and terms.  In sum, by forcing NSTAR to enter this particular contract and dictating the price and terms of that contract, the state encroached on the core of FERC's exclusive authority to regulate wholesale sales under the FPA.

---

[25] Cape Wind appears to contend that a state has free rein to regulate a utility's buyer-side conduct.  Cape Wind Mem. 12.  But a state may not use its regulatory authority over utilities to force those utilities to purchase electricity at a particular rate.  *See Nazarian*, 2013 WL 5432346, at *33 ("The Court does not perceive, for purposes of field preemption, any meaningful difference between state actions directed to the demand side and those directed to the supply side of the wholesale energy market . . . . [The proposition that] state regulation of such matters is void under the Supremacy Clause . . . holds firm whether the rate or price in question is that received by a generation facility for wholesale sales or is that paid by [a utility] for wholesale purchases.").

### 2.   FERC Has Never Addressed Any Argument Remotely Resembling Plaintiffs' Preemption Claim.

Defendants assert that "FERC itself has said that DPU's approval of the PPA does not usurp its authority."  State Mem. 25 (citing *Californians for Renewable Energy, Inc. (CARE) v. Nat'l Grid*, 137 FERC ¶ 61,113 (2011), Ex. 2 to State Mem.); Cape Wind Mem. 12.  That is a gross mischaracterization of the FERC order on which Defendants rely.  The *CARE* proceeding addressed only the National Grid–Cape Wind contract and did not address any preemption argument remotely resembling the one raised by Plaintiffs here.[26]  *See Californians for Renewable Energy, Inc. (CARE) v. Nat'l Grid*, 137 FERC ¶ 61,113, ¶¶ 61,591-92 (2011).  There was no allegation in the *CARE* proceeding that the National Grid contract was the result of state coercion, *see id.*, and indeed, National Grid voluntarily contracted with Cape Wind, *see* Comp. ¶¶ 46-48.  It was only with respect to *NSTAR* that Massachusetts used its regulatory authority to force the utility to enter into an above-market wholesale contract with the politically favored Cape Wind project.  Thus, FERC's *CARE* order in no way addressed whether Massachusetts's coercive efforts to force NSTAR into the Cape Wind contract violated the Federal Power Act.

### 3.   FERC's Eventual Review of the Reasonableness of the NSTAR–Cape Wind Contract Rate Does Not Deprive This Court of Jurisdiction to Determine Whether Massachusetts Violated the FPA.

Defendants further argue that there is no violation of the FPA because FERC, as it does for all wholesale contracts, will eventually determine whether the NSTAR–Cape Wind contract

---

[26] As FERC observed, the CARE complaint was "incomprehensible," "consist[ing] of a string of vague and unsupported allegations that the Massachusetts Commission's [approval of the National Grid/Cape Wind contract] violates the FPA, PURPA and previous Commission orders, allegations of fraudulent behavior and allegations of affiliation with international criminal organizations."  137 FERC ¶ 61,113, ¶¶ 61,591-92.  Thus, FERC denied the complaint largely on the ground that it had "fail[ed] to meet the requirements of the Commission's Rules of Practice and Procedure to lay out a case before the Commission and with evidentiary support rather than bare allegations."  *Id.* ¶ 61,592.

rate is just and reasonable.  *See* State Mem. 21, 25; Cape Wind Mem. 12-13.  Yet again,

however, Defendants misconstrue Plaintiffs' preemption claim.  This action is not a challenge to

the NSTAR–Cape Wind rate itself, but rather to Massachusetts's actions in forcing NSTAR to

accept that rate.  As the federal court in Maryland recently concluded in rejecting a materially

identical argument, where Plaintiffs claim that a state unlawfully dictated the terms of a

wholesale sale, the federal courts – not FERC – have "jurisdiction to answer the question of

whether the . . . state action is unconstitutional."  *Nazarian*, 2013 WL 5432346, at *41.  The fact

that FERC will eventually determine whether the rate dictated by the unlawful state action is just

and reasonable "does not strip this Court of jurisdiction to decide the constitutionality of the

[state's] regulatory actions and to enjoin enforcement of an unconstitutional state action."  *Id.*

      The very same reasoning applies here.  This Court – not FERC – has jurisdiction to

determine whether Massachusetts acted unlawfully when it forced NSTAR to enter into a

wholesale contract with Cape Wind.  The fact that FERC will eventually address whether the

NSTAR–Cape Wind contract price is reasonable does not deprive this Court of jurisdiction or

absolve Massachusetts's encroachment on the field occupied by the FPA.  *See id.*

## VII.    There Are No Grounds to Dismiss the Dormant Commerce Clause Claim.

      Plaintiffs allege that Massachusetts violated the dormant aspect of the Commerce Clause

by forcing NSTAR to give up cheaper out-of-state options and purchase wholesale electricity

from a politically favored in-state seller, Cape Wind.  Defendants claim that Plaintiffs lack

standing to raise such a claim and that the claim should be dismissed on the facts.  But those

arguments misconstrue case law, ignore critical allegations in the complaint, and rely on factual

assertions inappropriate for a motion to dismiss.  The dormant Commerce Clause claim should

not be dismissed.

### A.       Plaintiffs Have Standing to Bring a Dormant Commerce Clause Claim.

To establish standing, Plaintiffs need only show "a concrete and particularized injury in fact, a causal connection that permits tracing the claimed injury to the defendant's actions, and a likelihood that prevailing in the action will afford some redress for the injury." *Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*, 589 F.3d 458, 467 (1st Cir. 2009) (quotation marks omitted).  "The plaintiff need not show that 'the defendant's actions are the very last step in the chain of causation' for the injury.  It suffices if the plaintiff can show 'injury produced by determinative or coercive effect upon the action of someone else.'"  *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)).

Plaintiffs' standing is straightforward.  The Complaint alleges that each Plaintiff will suffer a concrete and particularized injury in fact because, as end-use customers of NSTAR, they will directly bear the above-market cost of the Cape Wind contract.  Compl. ¶¶ 95-97; Order 12-30, at 183 (approving NSTAR's recovery of "above-market costs . . . from all distribution customers").  The Complaint alleges that if NSTAR had been permitted to obtain wholesale electricity from competing sources, including those out-of-state, it could have purchased at prices less than one-half of what Cape Wind charges.  Compl. ¶ 95.

That injury in fact was caused by Defendants' action, *see id.*, because, as described above, they compelled NSTAR to contract with Cape Wind rather than a less expensive alternative in order to favor an in-state project that would promote job growth within the state. *Id.* ¶¶ 38-40.  And Plaintiffs' requested relief will redress their injury, because by invalidating DPU Order 12-30, NSTAR would no longer be permitted to charge Plaintiffs and other customers for the above-market costs of Cape Wind's electricity.

Notwithstanding that clear injury in fact, Defendants argue that Plaintiffs are not the proper parties to bring a Commerce Clause claim, and that the only parties who may do so are

"competitors for long-term renewable energy contracts who claim to have lost out on an opportunity to compete in Massachusetts by virtue of out-of-state discrimination."  State Mem. 27; Cape Wind Mem. 16.  The law, however, does not support that contention.

In *General Motors Corp. v. Tracy*, the Supreme Court clarified that "cognizable injury from unconstitutional discrimination against interstate commerce does *not* stop at members of the class against whom a State ultimately discriminates."  519 U.S. 278, 286 (1997) (emphasis added).  Here, therefore, Cape Wind's out-of-state competitors are not the only ones who have standing, as Defendants claim.  Rather, as *Tracy* explained, "*customers* of [the class against whom a State ultimately discriminates] may also be injured," 519 U.S. at 286 (emphasis added), and here, Plaintiffs (who are NSTAR customers) are unquestionably injured because it is undisputed that NSTAR will pass on all the costs of the Cape Wind contract to its customers.

Likewise, in *Alliance of Automobile Manufacturers v. Gwadosky*, 430 F.3d 30 (1st Cir. 2005), the First Circuit held that an association of automobile manufacturers had standing to bring a dormant Commerce Clause claim complaining of discrimination against out-of-state automobile dealers and in favor of in-state dealers.  The court reasoned that a manufacturer had "suffered concrete pecuniary injury" as a result of the challenged state law, and "[t]hat injury is enough to ground . . . standing to sue even though [the manufacturer] is not a member of the out-of-state class against whom the [state law] ostensibly discriminates."  *Id.* at 37.  The same logic applies here:  Plaintiffs suffer a concrete pecuniary injury as a result of the state's discrimination, and that is enough to ground standing for a Commerce Clause claim.

The authorities Defendants cite are not to the contrary.  In *DaimlerChrysler Corp. v. Cuno* (cited in State Mem. 27), the plaintiff lacked standing because its "alleged injury [was] based on the asserted effect of the allegedly illegal activity on public revenues, to which the

[plaintiff as] taxpayer contributes." 547 U.S. 332, 344 (2006). But here Plaintiffs are not

alleging any such "taxpayer standing." *Id.* at 345. Plaintiffs raise no challenge to any tax or any

expenditure of public revenues. Rather, Plaintiffs' injury is based on the increased cost they

must pay in purchasing electricity, and their standing derives not from their status as taxpayers

but as their status as "customers" of "the class against whom a State ultimately discriminates."

*Tracy*, 519 U.S. at 286.

Nor are Defendants aided by *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin

County*, 115 F.3d 1372, 1381 (8th Cir. 1997) (cited in State Mem. 28-29). That out-of-circuit

case concerned a county ordinance that favored in-state waste haulers, and the court determined

that the customers of the haulers had no prudential standing to bring a Commerce Clause claim,

even though they likely paid higher costs as a result of the ordinance. *Id.* at 1379-81. The First

Circuit, however, has adopted a more expansive view of prudential standing. As discussed

above, in *Gwadosky*, the First Circuit held that the plaintiffs had standing to challenge a law

under the Commerce Clause even though they were not part of the class that was discriminated

against, because the plaintiffs would "bear the true cost" of the state regulation. 430 F.3d at 38.

The same is true here: Plaintiffs bear the true cost of the contract approved in DPU Order 12-30.

Moreover, even if *Ben Oehrleins* were the law in this Circuit, it still would not control

this case. In the ordinary case in which a consumer claims standing on the basis that an upstream

party has incurred higher costs that it may have passed on, the injury is indirect and mediated by

myriad market factors that may determine whether, and how much, of the added cost can be

passed downstream to the consumer. In *Ben Oehrleins*, for example, it was up to the haulers to

determine whether and to what degree to pass on their higher costs to customers, and the

customers, to establish standing, presumably would need to adduce complex economic testimony

tracing those costs.  There may be good prudential reasons not to allow such suits.  Here, however, the injury to Plaintiffs is direct, transparent, and essentially undisputed.  Indeed, NSTAR essentially purchases wholesale electricity *on behalf of* its customers, because under the regulatory scheme, NSTAR is permitted to pass every penny of its costs under the contract to its customers, including Plaintiffs, *see* Compl. ¶¶ 94-97, DPU Order 12-30, at 182-89.  That distinguishes this case from *Ben Oehrleins.  See Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 182-83 (1st Cir. 1999) (declining to decide whether to follow *Ben Oehrleins* and holding that "a classic plaintiff asserting his own economic interests under the Commerce Clause" had standing to bring suit).[27]

### B.  Massachusetts Violated the Commerce Clause by Forcing NSTAR to Enter Into a Contract with a Politically Favored In-State Generator.

The "dormant" aspect of the Commerce Clause prohibits states from using their regulatory power to discriminate in favor of in-state producers as compared to producers located outside of the state.  *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 389-90 (1994); *W. Lynn Creamery*, 512 U.S. at 192; *Wyoming v. Oklahoma*, 502 U.S. 437, 454-55 (1992).  Forbidden discrimination "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."  *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007) (quotation marks omitted); *W. Lynn Creamery*, 512 U.S. at 192 (the "'negative' aspect of the Commerce Clause prohibits

---

[27] As an added reason for denying prudential standing, *Ben Oehrleins* held that "there [was] no indication that allowing standing to the [customers] is necessary to insure protection of the rights asserted."  *Ben Oehrleins*, 115 F.3d at 1381 (internal quotation marks omitted).  But that was only because the waste haulers had themselves brought suit.  *See id.*  Here, NSTAR has not brought suit "to insure protection of the rights asserted," *id.* (internal quotation marks omitted), likely in part because NSTAR may pass on all of the above-market costs of the Cape Wind contract to customers such as Plaintiffs.  Permitting Plaintiffs to proceed with this suit may be the only way that Massachusetts's alleged violation of the Commerce Clause can be redressed, and that is yet another reason to reject Defendants' reliance on the prudential standing doctrine.

economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors" (quotation marks omitted)).  "A finding that state legislation constitutes economic protectionism may be made on the basis of either discriminatory purpose or discriminatory effect."  *Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 344 n. 6 (1992) (citations and quotation marks omitted); *accord Bacchus Imps., Ltd. v. Dias*, 468 U.S. 263, 270-273 (1984).  Here, Plaintiffs have stated a claim under both theories.

*First*, Plaintiffs have stated a claim that Massachusetts regulators were motivated by a purpose to discriminate against interstate commerce.  The Green Communities Act – which, as discussed above, requires Massachusetts utilities such as NSTAR to purchase a certain amount of wholesale power from renewable sources – originally required utilities to purchase from renewable generators *in Massachusetts*.  It was only when a lawsuit was filed under the dormant Commerce Clause that Massachusetts regulators agreed not to enforce that blatantly discriminatory provision.  *See* Compl. ¶¶ 49-52.  Yet as alleged in the complaint, the intent to favor in-state generators remained, and Massachusetts regulators were acting on that intent when they forced NSTAR to contract with Cape Wind as a condition of its merger approval.  *Id.* ¶ 116. The First Circuit has expressly recognized that the existence of a "facially discriminatory and unconstitutional predecessor" statute strengthens the inference that facially neutral state action has a discriminatory purpose, *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 14 (1st Cir. 2010), which is the exact situation here.

Numerous statements by Governor Patrick and members of his administration confirm that NSTAR was forced into the Cape Wind contract because of a desire by the state to insulate Cape Wind from interstate competition.  *See, e.g.*, Compl. ¶ 39 (Governor touted in-state jobs created by Cape Wind); *id.* (Governor: "States with Democratic, Republican and Independent

47

Governors are working with the Obama Administration on a collaborative process to responsibly site future offshore wind projects.  But let me be clear: they are all racing for second place, because Massachusetts will be first."); *id.* ¶ 40 (Secretary of Energy and Environmental Affairs: "[Massachusetts would] stand to gain from having the first offshore wind farm in the U.S. built here. . . . But only one state can reap the particular economic benefits of being the first mover – and with Cape Wind going forward, it will be Massachusetts.").  As the First Circuit has explained, comments by government officials, such as legislators and state commissioners, are "precisely the kind of evidence the Supreme Court has looked to in previous Commerce Clause cases challenging a statute as discriminatory in purpose."  *Family Winemakers*, 592 F.3d at 7 n.4.

*Second*, Plaintiffs have pleaded a claim that Massachusetts' actions had the *effect* of discriminating against interstate commerce.  A law is discriminatory in effect "when, in practice, it affects similarly situated entities in a market by imposing disproportionate burdens on out-of-state interests and conferring advantages upon in-state interests."  *Family Winemakers*, 592 F.3d at 10.  Here, Massachusetts has favored a Massachusetts generator – Cape Wind – over out-of-state generators, and that state action indubitably has a discriminatory effect.  Thus, Massachusetts must show that its act of favoritism "serves a legitimate local purpose that cannot be attained through reasonable non-discriminatory alternatives," *id.* at 17, a burden that cannot possibly be sustained at the motion to dismiss stage.

Indeed, State Defendants do not make any serious attempt to argue that the myriad factual disputes in resolving Dormant Commerce Clause claim can be resolved on the pleadings.  Instead, they make only two arguments, both of which are meritless.  First, they contend that Section 83, as currently written, "is neutral on its face regarding in-state vs. out-of-state competitors."  State Mem. 29.  To the extent State Defendants contend that facially neutral

regulation is exempt from a dormant Commerce Clause challenge, they are wrong.  *Family Winemakers*, 592 F.3d at 5 ("facially neutral but discriminatory" state laws may be challenged under Dormant Commerce Clause).  In any event, Plaintiffs do not challenge Section 83; they challenge DOER's act of discriminating against interstate commerce.  DOER's insistence that NSTAR purchase electricity from a Massachusetts-based provider, and eschew out-of-state providers, is the antithesis of facial neutrality.

Second, State Defendants argue that the DPU has already ruled against Plaintiffs' challenges.  State Mem. 29.  As explained above, the DPU's decisions are without preclusive force.  *Supra* pp. 16-19.  But even if they were, State Defendants' preclusion argument as to the dormant Commerce Clause challenge would clearly fail.  State Defendants rely on DPU's rejection of a Dormant Commerce Clause challenge to the *National Grid* contract, *id.* at 29, but that was a completely separate contract involving an electric company which, unlike NSTAR, *voluntarily* contracted with National Grid.  Compl. ¶ 49 ("Cape Wind could not persuade NSTAR to enter into a no-bid power purchase agreement at Cape Wind's inflated rates, as National Grid had done.").  As for State Defendants' citation to DPU Order 12-30, State Mem. at 29-30, that discussion did not even *mention* a dormant Commerce Clause challenge.  In short, Plaintiffs' dormant Commerce Clause allegations have never been tested in any forum.

## CONCLUSION

For the foregoing reasons, the motions to dismiss should be denied.


April 14, 2014                                          Respectfully submitted,

/s/ Ira H. Zaleznik                                    /s/ Matthew E. Price

Ira H. Zaleznik (BBO# 538800)                          Matthew E. Price (BBO# 668990)
Joshua M. D. Segal (BBO# 678367)                       Adam G. Unikowsky*
Lawson &Weitzen, LLP                                   Matthew S. McKenzie*
88 Black Falcon Avenue, Suite 345                      Jenner & Block LLP
Boston, MA 02210                                       1099 New York Avenue NW Suite 900
Tel. (617) 439-4990                                    Washington, DC 20001
Email: izaleznik@lawson-weitzen.com                    Tel. (202) 639-6000
      jsegal@lawson-weitzen.com       Email: mprice@jenner.com
                                                             aunikowsky@jenner.com
*Counsel for Town of Barnstable, Mass.*                      mmckenzie@jenner.com

                                                       Robert A. Bianchi  (BBO# 042360)
                                                       Robert A. Bianchi & Associates
                                                       55 Sea St. Extension
                                                       P.O. Box 128
                                                       Hyannis, MA 02601
                                                       Tel. (508) 775-0785
                                                       Email: robbianchi@aol.com

                                                       *Counsel for Hyannis Marina, Inc., Marjon
                                                       Print & Frame Shop Ltd.. The Keller
                                                       Company, Inc., The Alliance to Protect
                                                       Nantucket Sound, Sandra P. Taylor, and
                                                       Jamie Regan*

                                                       *Admitted *pro hac vice*.

**CERTIFICATE OF SERVICE**

I certify that this document, filed through the Court's ECF system, will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and that electronic (PDF) copies will be sent to those indicated as non-registered participants by email on April 14, 2014.

/s/ Matthew E. Price
Matthew E. Price