UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 14-10148-RGS

TOWN OF BARNSTABLE, MASSACHUSETTS, et al.

v.

ANN G. BERWICK, et al.

MEMORANDUM AND ORDER
ON STATE DEFENDANTS' MOTION TO DISMISS

May 2, 2014

STEARNS, J.

This Complaint is the latest chapter in a long-running saga involving the siting of a wind farm in Nantucket Sound. The dispute pits the Commonwealth of Massachusetts and the diversified energy policy espoused by Governor Deval Patrick against an obdurate band of aggrieved residents of Cape Cod and the Islands. Both sides in the dispute claim the mantle of environmentalism, although for present purposes, plaintiffs[1] have doffed their green garb and draped themselves in the banner of free-market economics. Plaintiffs filed the Complaint on January 21, 2014, seeking

---

[1] Town of Barnstable, Massachusetts; Hyannis Marina, Inc.; Marjon Print and Frame Shop Ltd.; The Keller Company, Inc.; The Alliance to Protect Nantucket Sound (Alliance); Sandra P. Taylor; and Jamie Regan.

declaratory and injunctive relief against various State Defendants,[2] while naming Cape Wind Associates, LLC (Cape Wind) and NSTAR Electric Company (NSTAR) as required parties, pursuant to Fed. R. Civ. P. 19(a). Plaintiffs allege violations of the "dormant" Commerce Clause and the Supremacy Clause of the United States Constitution and pray that the court abrogate an order of the DPU approving an energy-supply contract entered into between NSTAR and Cape Wind.   All defendants have moved to dismiss (the State Defendants collectively, and Cape Wind and NSTAR separately).[3]

## BACKGROUND

Cape Wind is a for-profit company with plans to develop a wind-powered renewable energy generation facility in federal waters in

---

[2] The State Defendants are Ann G. Berwick, in her official capacity as Chair of the Massachusetts Department of Public Utilities (DPU); Jolette A. Westbrook and David W. Cash, in their official capacities as Commissioners of the DPU; and Mark Sylvia, in his official capacity as Commissioner of the Massachusetts Department of Energy Resources (DOER).

[3] In the context of a motion to dismiss, plaintiff's plausible allegations of facts are assumed to be true.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-556 (2007).  Additionally, "documents the authenticity of which are not disputed by the parties; [] official public records; [] documents central to plaintiffs' claim; or [] documents sufficiently referred to in the complaint" may also be considered on a motion to dismiss.  *Alt. Energy Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001) (citation omitted).

Nantucket Sound, a triangular-shaped 750 square-mile tract of the Atlantic Ocean bounded by Cape Cod and the Islands of Martha's Vineyard and Nantucket. The proposed wind facility is to consist of 130 horizontal-axis wind turbines dispersed over 24 square miles of open ocean, and is designed to generate 454 megawatts of electricity at peak operation.

In 2001, Cape Wind applied for a permit to build the wind facility on Horseshoe Shoals in the Sound, some five miles from the Cape Cod coastline and roughly 16 miles from the Town of Nantucket. In August of 2002, the U.S. Army Corps of Engineers granted Cape Wind a permit to build a meteorological tower to gather data in preparation for the project. As Judge Tauro presciently predicted in rejecting a suit against the Corps of Engineers' action, this was just "the first skirmish in an eventual battle." *Ten Taxpayer Citizen Grp. v. Cape Wind Assocs., LLC,* 278 F. Supp. 2d 98, 99 (D. Mass. 2003). The Alliance, the leading plaintiff in this action, filed a parallel (and equally unsuccessful) lawsuit also challenging the permitting authority of the Corps of Engineers. *See Alliance to Protect Nantucket Sound, Inc. v. U.S. Dep't of the Army,* 288 F. Supp. 2d 64 (D. Mass. 2003), *aff'd,* 398 F.3d 105 (1st Cir. 2005).[4]

---

[4] In affirming the district court's dismissal of this challenge, the First Circuit summarily held that "[i]n this case, however, we find it unnecessary

In 2005, the Massachusetts Energy Facilities Siting Board approved the construction of two undersea electric transmission cables to connect the proposed wind facility with the regional power grid. The Alliance promptly filed suit protesting the approval.[5] In 2007, the Secretary of the Executive Office of Energy and Environmental Affairs issued a certificate approving Cape Wind's Final Environmental Impact Report. The Ten Taxpayers Group filed a suit in response.[6] The Supreme Judicial Court (SJC) and the Superior Court ultimately dismissed the two lawsuits, separately holding that the Board and the Secretary had each exercised their approval authority appropriately by deferring where necessary to federal jurisdiction.[7] The Town of Barnstable, also a plaintiff in this case, meanwhile filed a lawsuit of its own against the Siting Board. *See Town of*

---

to reach the question of *Chevron* deference [the principal ground invoked by the district court] because legislative history reveals, with exceptional clarity, Congress's intent that [the Corps' jurisdiction] not be restricted [in the manner the Alliance argued for]." *Alliance to Protect Nantucket Sound, Inc. v. U.S. Dep't of the Army,* 398 F.3d 105, 109 (1st Cir. 2005).

[5] *Alliance to Protect Nantucket Sound, Inc. v. Energy Facilities Sitting Bd.*, 448 Mass. 45 (2006).

[6] *Ten Taxpayer Citizens Grp. v. Sec'y Office of Envtl. Affairs*, 24 Mass. L. Rptr. 539 (2008).

[7] Both approvals were conditioned on Cape Wind obtaining the necessary permits to begin construction of the wind farm, including all necessary federal licenses.

*Barnstable v. Mass. Energy Facilities Siting Bd.,* 25 Mass. L. Rptr. 375 (2009).  The Alliance, the Ten Taxpayer Group, and the Town of Barnstable then joined all of their grievances in another Superior Court lawsuit, *Town of Barnstable v. Cape Wind Assocs., LLC,* 27 Mass. L. Rptr. 1111 (2010), followed by another onslaught against the Facilities Siting Board.  *See Alliance to Protect Nantucket Sound, Inc. v. Energy Facilities Siting Bd.,* 457 Mass. 663 (2010) (affirming the Siting Board's authority to issue the environmental certificate).[8]

In April of 2010, Kenneth Salazar, the United States Secretary of the Interior, issued a Record of Decision giving federal approval to the Cape

---

[8] Other legal challenges continued to plague Cape Wind.  Plaintiffs here, and others, including the Wampanoag Native American Tribe, also repaired to the federal court in the District of Columbia where they filed a series of cases asserting violations of the Administrative Procedure Act, the Endangered Species Act, the Migratory Bird Treaty Act, the National Environmental Policy Act, the Outer Continental Shelf Lands Act, the Coast Guard and Maritime Transportation Act, the Energy Policy Act, the National Historic Preservation Act, and the Rivers and Harbors Act.  The cases were consolidated by the district court.  On March 14, 2014, Judge Walton issued a lengthy decision allowing summary judgment for all defendants on all issues with two relatively minor exceptions (the fisheries and wildlife services were directed to consider the reasonableness of mandated turbine feathering operational adjustments and the possible incidental take of North Atlantic right whales). *See PEER v. Beaudreau*, 2014 WL 985394 (D.D.C. Mar. 14, 2014).

Wind project.[9]  The Secretary also issued a lease to Cape Wind to operate a wind energy facility on Horseshoe Shoals, effective November 1, 2010. Notwithstanding, as one academic observer has accurately stated, "[d]espite full federal and state approval of the project, CWA has continued to face vehement opposition from local groups."[10]

**The Green Communities Act**

In 2008, the Massachusetts Legislature passed the Green Communities Act (GCA), Mass. St. 2008, ch. 169.[11]  Section 83 of the GCA

---

[9] The Energy Policy Act of 2005 authorized the Department of the Interior to grant leases for energy transmissions from the Outer Continental Shelf for sources other than gas and oil.

[10] Timothy H. Powell, *Revisiting Federalism Concerns in the Offshore Wind Energy Industry in Light of Continued Local Opposition to the Cape Wind Project*, 92 B.U. L. Rev. 2023, 2037 (2012).

[11] The SJC in a related case summarized the mission and mandate of the GCA as follows:  "The stated purpose of the GCA is to 'provide forthwith for renewable and alternative energy and energy efficiency in the [C]ommonwealth' . . . . [GCA section 83] requires electricity distribution companies to seek proposals from renewable energy developers twice in a five-year period beginning on July 1, 2009, and, if reasonable proposals are received, enter into long-term [Power Purchase Agreements (PPAs)] to facilitate the financing of renewable energy generation facilities. . . . In evaluating a PPA proposed under § 83, the [DPU] must consider its costs and benefits, and may only approve the contract on a finding that it is a 'cost effective mechanism for procuring renewable energy on a long-term basis.'"  *Alliance to Protect Nantucket Sound, Inc. v. Dep't of Pub. Utils.*, 461 Mass. 166, 168-169 (2011).

requires Massachusetts electric utilities to solicit long term supply proposals from renewable energy generators. Among the favored suppliers are generators of wind energy like Cape Wind. The GCA requires DPU-regulated utilities to obtain at least three percent of their total energy supply from "green" sources.

As originally enacted, the GCA contained a provision requiring that all eligible alternative energy suppliers be located within Massachusetts or its adjacent state and federal waters. On June 9, 2010, the DPU suspended the territorial restriction[12] after TransCanada Power Marketing Ltd. challenged the limitation in federal court under the dormant Commerce Clause.[13] In 2012, the Legislature amended the GCA to eliminate the geographical restriction.

**The National Grid – Cape Wind Contract**

---

[12] Section 83 of the GCA stated that if any provision of the section was subject to a judicial challenge, the DPU would be "'entitled to suspend the applicability of the challenged provision pending the outcome of the judicial proceeding, and to issue any necessary orders to ensure that the unchallenged sections of the Act remain in effect.'" *Alliance*, 461 Mass. at 170 (quoting Mass. St. 2008, ch. 169, § 83, tenth par.). The DPU issued an order removing the words "within the Commonwealth of Massachusetts" from section 83 and any associated regulations.

[13] *See TransCanada Power Mktg. Ltd. v. Bowles,* No. 4:10-cv-40070-TSH (D. Mass. filed April 16, 2010).

In December of 2009, National Grid, a competitor of defendant NSTAR, sought approval from the DPU to enter into negotiations with Cape Wind over a long-term energy-supply contract.[14]  The parties signed a Power Purchase Agreement (PPA) on May 7, 2010.  Plaintiffs allege that the contract prices that National Grid agreed to pay were significantly above the market price for electricity in general and well above the price being charged by other generators of renewable energy in 2010.  Compl. ¶ 48.  In May of 2010, National Grid submitted two Cape Wind contracts to DPU for approval.  DPU approved the first contract (for 50% of Cape Wind's anticipated power supply to be distributed by National Grid), but rejected the second (for the remaining 50%, to be assigned to another purchaser for distribution).[15]

Two separate avenues of appeal were taken from DPU's approval of the National Grid contract.  The Alliance (along with TransCanada)

---

[14]  GCA regulations required National Grid to submit a timetable and method of solicitation to DPU for review and approval prior to soliciting an offer.

[15] Because the PPAs were negotiated prior to the suspension of the geographical restriction in the GCA, DPU required National Grid to demonstrate that the contracts had not been influenced by the now-suspended limitation.  DPU held thirteen days of evidentiary hearings involving National Grid and nineteen intervening parties (including the Alliance).

appealed directly to the SJC, asserting, among other claims, that DPU's approval of the contract violated the dormant Commerce Clause. The SJC rebuffed the objections and affirmed DPU's decision, specifically rejecting the dormant Commerce Clause claim. *See Alliance,* 461 Mass. at 174 (noting that "[t]he constitutional challenge advanced by the Alliance and TransCanada fails").[16] A second group of plaintiffs filed a challenge with the Federal Energy Regulatory Commission (FERC), alleging that the DPU had violated the Supremacy Clause by encroaching on FERC's exclusive prerogative under the Federal Power Act (FPA) to set national wholesale electricity prices. FERC rejected the argument for, among other reasons, the fact that the contract as approved by DPU explicitly required the parties to obtain wholesale rate clearances from FERC. *See Californians for Renewable Energy, Inc. (CARE) & Barbara Durkin v. Nat'l Grid, Cape Wind, & DPU,* Order Dismissing Complaint, 137 FERC ¶ 61,113 (2011).[17]

---

[16] The SJC also acknowledged a potential standing deficiency with respect to plaintiff Alliance. *See Id.* at 173 n. 13 ("The Alliance has not alleged that it or any of its members have been harmed in their ability to compete for § 83 contracts by the claimed infringement of the commerce clause. However, because TransCanda has alleged such harm, we consider the claim.").

[17] "To the extent the complainants instead challenge rates as unjust and unreasonable under the FPA, they have not shown how they are unjust and unreasonable. The contracts approved by the Massachusetts Commission indicate that the wind facilities must either have QF status or file rates with this Commission pursuant to section 205 of the FPA. Cape

## The NSTAR – Cape Wind Contract

After the suspension of the geographical limitation, DPU had directed NSTAR and other utilities to reopen their Requests for Proposals (RFPs) to take bids from out-of-state generators. Compl. ¶ 53. NSTAR did so and ultimately contracted with three land-based wind generators, Groton Wind, LLC, New England Wind, LLC, and Blue Sky East, LLC. *Id.* ¶ 54. Plaintiffs allege that the price of wind energy from NSTAR's contracts with the three land-based generators was approximately one-half the initial price agreed to by National Grid in its contract with Cape Wind. *Id.* ¶¶ 55-57. NSTAR chose not to enter a contract with Cape Wind. *Id.* ¶ 56. Plaintiffs allege that NSTAR's "refusal" to contract with Cape Wind threatened the very existence of the project because National Grid had secured DPU approval to distribute only half of the wind farm's output (the second National Grid contract, for the remaining 50% had been rejected by the DPU). *Id.* ¶ 58.

On November 24, 2010, NSTAR filed an application with DPU for approval of a merger between it and Northeast Utilities.[18] The Department

---

Wind indicates that its rates will be filed with this Commission. Complainants will have the opportunity to intervene in any proceeding seeking Commission approval of those rates." *Id.*

[18] Under Mass. Gen. Laws ch. 164, § 96, DPU has the sole authority to approve mergers of utilities subject to its jurisdiction, including NSTAR.

of Energy Resources (DOER), the agency responsible for implementing the state's renewable energy priorities (*see* Mass. Gen. Laws ch. 25A, § 6), intervened in the merger proceedings. DOER had no power to veto the merger,[19] but requested that DPU modify its standard of review from "no net harm" to one that would "determine whether the proposed merger will provide a substantial net benefit to the public interest . . . ." Compl. ¶ 66. In response, DPU entered an Interlocutory Order acknowledging that the GCA (and the related Global Warming Solutions Act (GWSA)) required it to reconsider its standard of review, and adopted the "net benefits" standard.

In July of 2011, DOER asked the DPU to stay the merger pending an assessment of its potential impact on consumers. NSTAR and Northeast argued that a stay would derail the merger. Compl. ¶ 68. On September 28, 2011, DOER submitted a filing urging DPU to require NSTAR to purchase off-shore wind energy as a condition for approving the merger. *Id.* ¶ 70. NSTAR and Northeast opposed the request, arguing a potential

Plaintiffs allege that, at the time of the merger application, neither NSTAR nor Northeast was involved in "significant negotiations" with Cape Wind to purchase power. Compl. ¶ 61.

[19] In their Complaint, plaintiffs take the position that DOER had the ultimate power to block the NSTAR-Northeast merger, although elsewhere they have acknowledged that the approval power is vested solely in the DPU (as the statute makes clear). *See* Dkt. #38 at 9 (State Defendants' brief, quoting the Alliance in other matters).

violation of the dormant Commerce Clause as Cape Wind appeared to be the only viable off-shore wind developer. Plaintiffs allege that NSTAR representatives subsequently entered into "secret negotiations with the Patrick Administration." *Id.* ¶ 75. On February 15, 2012, NSTAR and DOER entered into a settlement agreement, which included a condition that NSTAR pursue a PPA with Cape Wind on terms that were "substantially the same" as those of the National Grid-Cape Wind contract. The settlement agreement was subject to DPU approval.

On February 24, 2012, NSTAR submitted to DPU a Memorandum of Understanding (MOU) between NSTAR, DOER, and Cape Wind setting out a timetable and method of solicitation of GCA bid proposals. The DPU invited comment on the MOU, and the Alliance, among others, submitted statements in opposition (including allegations that DOER had violated the dormant Commerce Clause). On March 22, 2012, DPU approved the MOU. The Alliance appealed the DPU's order to the SJC, but subsequently withdrew the appeal. *See Alliance to Protect Nantucket Sound v. Dep't of Pub. Utils.,* No. SJC-2012-0171 (filed Apr. 23, 2012; dismissed Jan. 8, 2013). On April 4, 2012, DPU approved the merger between NSTAR and Northeast.

On March 23, 2012, NSTAR and Cape Wind executed a PPA under which NSTAR agreed to purchase energy, capacity, and renewable power certificates from Cape Wind over a 15-year period. Compl. ¶¶ 84 and 86. On March 30, 2012, NSTAR submitted the PPA to DPU for approval. *Id.* ¶¶ 84 and 90. The contract required Cape Wind to comply with the rules of FERC and other government entities, and required Cape Wind to obtain and maintain the requisite permits and approvals from FERC, including wholesale rates clearances. Alliance intervened in the proceedings, which included three public hearings and two evidentiary hearings. On November 26, 2012, DPU approved the PPA. Neither the Alliance nor any other party to the proceedings appealed DPU's final decision to the SJC. On January 14, 2014, over fourteen months after the DPU's decision, plaintiffs filed this case.

## DISCUSSION

Plaintiffs seek a declaration that Massachusetts violated both the dormant Commerce Clause and the Supremacy Clause "when it used its influence over NSTAR's merger request to bring about NSTAR's entry into an above-market wholesale electricity contract with Cape Wind, a politically favored renewable energy project in Massachusetts, to buy electricity at a particular price." Compl. ¶ 4. Plaintiffs also seek injunctive relief to

"remedy the constitutional violation" by invalidating the Cape Wind contract that "Massachusetts compelled NSTAR to enter." *Id.* Plaintiffs allege that this is necessary to "alleviate the increased electricity costs that NSTAR customers such as Plaintiffs will be forced to pay as a result of the illegal, above-market contract." *Id.*

Plaintiffs' Complaint sets out two causes of action. In Count I, plaintiffs allege that DOER "intruded on FERC's exclusive jurisdiction to regulate wholesale electric energy prices" in violation of the Supremacy Clause and the Federal Civil Rights Act, 42 U.S.C. § 1983.[20] Compl. ¶ 107. In Count II, plaintiffs allege that "by conditioning its approval of the merger on the execution of a PPA between NSTAR and Cape Wind, DOER prevented out-of-state generation facilities from competing with Cape Wind," in violation of the dormant Commerce Clause and 42 U.S.C. § 1983. *Id.* ¶ 115. Defendants seek dismissal of the Complaint on numerous grounds, including sovereign immunity, *Burford* abstention, comity, claim

---

[20] Section 1983 "does not, by its own terms, create substantive rights; it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996); *see also Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979) (same). A violation of a "right" that is not "secured" by federal law is not actionable under section 1983. *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989). At the hearing on the motion to dismiss, plaintiffs' counsel conceded that section 1983 does not authorize a private right of action based on the Supremacy Clause and that plaintiffs were relying instead on a right of direct action.

preclusion, standing, and failure to state a claim. As the debate begins and ends with the Eleventh Amendment, I will devote the bulk of the discussion to the doctrine of sovereign immunity, and then briefly explain why neither the Supremacy Clause nor the dormant Commerce Clause give rise to a substantive right of action benefitting plaintiffs.

The Eleventh Amendment states that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign state." U.S. Const. amend. XI. "The Supreme Court . . . has expanded the doctrine of sovereign immunity beyond the literal words of the Eleventh Amendment, holding that state governments, absent their consent, are not only immune from suit by citizens of another state, but by their own citizens as well." *Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 529 n.23 (1st Cir. 2009) (citing *Alden v. Maine*, 527 U.S. 706, 728-729 (1999)).[21] "The Eleventh Amendment largely shields States from suit in federal court without their consent, leaving parties with claims against a State to present them, if the State permits, in the State's own tribunals." *Pastrana-Torres v.*

---

[21] The Commonwealth has not consented to being sued for money damages in either the federal courts or in its own courts under section 1983. *Woodbridge v. Worcester State Hosp.,* 384 Mass. 38, 44-45 (1981).

*Corporacion de Puerto Rico Para La Difusion Publica*, 460 F.3d 124, 126 (1st Cir. 2006) (quoting *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 39 (1994)). A state entity is similarly immune from suit if it functions as an "arm of the state." *Coggeshall v. Mass. Bd. of Registration of Psychologists*, 604 F.3d 658, 662 (1st Cir. 2010).

A suit against a government official in his or her official capacity is the same as a suit "against [the] entity of which [the] officer is an agent." *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). Thus, a plaintiff may not resort to the expedient of naming a state official as a defendant as a means of circumventing the Eleventh Amendment. *Muirhead v. Meacham*, 427 F.3d 14, 18 (1st Cir. 2005) (quoting *Dugan v. Rank*, 372 U.S. 609, 620 (1963)). A narrow exception to the rule has been carved out by *Ex parte Young*, 209 U.S. 123, 159-160 (1908), and *Home Tel. & Tel. Co. v. City of Los Angeles*, 227 U.S. 278, 293-294 (1913). The Eleventh Amendment does not bar a suit against a State officer in his or her official capacity where the complaining party seeks *prospective* equitable relief from a continuing violation of federal law. *Green v. Mansour*, 474 U.S. 64, 68 (1985). A classic example is *Georgia R.R. & Banking Co. v. Redwine*, 342 U.S. 299 (1952), in which the plaintiff railroad sought to enjoin the Georgia State Revenue Commissioner from

assessing or collecting *ad volarem* taxes in violation of the Article I prohibition against the enactment by any State of a law impairing the obligation of contracts. U.S. Const., Art. I, § 10, cl. 1. The Supreme Court affirmed the jurisdiction of the district court to grant the relief requested. "This Court has long held that a suit to restrain unconstitutional action threatened by an individual who is a state officer is not a suit against the State." *Id.* at 304. *See also Edelman v. Jordan,* 415 U.S. 651, 664 (1974) ("[T]he relief awarded in *Ex parte Young* was prospective only; the Attorney General of Minnesota was enjoined to conform his *future* conduct of that office to the requirement of the Fourteenth Amendment.") (emphasis added); *Rosie D. v. Swift,* 310 F.3d 230, 234 (1st Cir. 2002) (observing that the *Ex parte Young* exception allows a federal court to "enjoin state officials to conform *future conduct* to the requirements of federal law.") (emphasis added).

The rule is different where the relief sought is retroactive in nature. "[A] suit, although nominally aimed at an official, will be considered one against the sovereign 'if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act.'" *Muirhead*, 427 F.3d at 18 (quoting *Dugan,*

17

372 U.S. at 620). As summarized by Professor Tribe, "[a]ctions for retroactive relief, even when styled as requests for an injunction and even if nominally directed against state officers and not the state itself, will ordinarily be barred by the Eleventh Amendment if the effect of the judgment is to burden the state treasury." Laurence H. Tribe, *American Constitutional Law* § 3-25 at 535 n.99 (3d ed. 2000).

That the relief being sought here is retroactive and thus barred by the Eleventh Amendment is easily ascertained by turning to the specific demands set out in plaintiffs' Complaint for Declaratory and Injunctive Relief. Prayers (a), (b), and (c) seek a declaration that (1) the DPU acted illegally in "forcing" NSTAR to enter a contract with Cape Wind at a specified price,[22] (2) that the DPU's order approving the contract is therefore null and void, and (3) that the contract is thus "null and void and without legal force or effect." Prayer (d) is a variant on (a) through (c) that seeks an injunction preventing DPU from taking any steps to enforce its order approving the contract and to do whatever is necessary to remedy the

---

[22] While ordinarily the court will accept plausible facts set out in the Complaint as true, this is not the case where, as here, documents referenced in the Complaint (specifically the DPU order) contradict on their face a supposed fact as plead. The allegation that DPU dictated that NSTAR procure power from Cape Wind at a specified price is misleading and ultimately untrue.

constitutional harms caused by its allowing the contract to take effect. An award of prospective declaratory relief that has "much the same effect as a full-fledged award of damages or restitution by the federal court" is a form of relief distinctly barred by the Eleventh Amendment. *Mills v. State of Maine*, 118 F.3d 37, 54-55 (1st Cir. 1997). Here the effect of a declaration that Massachusetts had illegally compelled NSAR and Cape Wind to enter an above-market price contract for wind energy would inevitably lead to restitutionary claims against the Commonwealth by NSTAR and Cape Wind, while an injunction ordering DPU to cease enforcement of the PPA and to take remedial measures for the alleged constitutional harms[23] would restrain the State from acting by frustrating its efforts to implement the policies enunciated in the GCA and the GWSA, while further bleeding the treasury.

Plaintiffs attempt unsuccessfully to distinguish the cases in which sovereign immunity was found to compel dismissal of an action against

---

[23] The retrospective nature of plaintiffs' injunctive request is underscored by the demand that DPU take remedial steps to return the relationship between NSTAR and Cape Wind to the *status quo ante*. However, with respect to the PPA itself, there is nothing further for DPU (or DOER) to do – the PPA is an historical fact and neither agency has any further action to take, whether of an approval or enforcement nature. As defendants accurately state in their Memorandum, "not a single allegation of the Complaint identifies or alludes to any future actions the State Defendants must take with respect to the contract." Def's Mem. at 15.

state officials, including a recent decision by this court, *Tyler v. Massachusetts*, 2013 WL 5948092 (D. Mass. Nov. 7, 2013). Plaintiffs state that, "DPU Order 12-30 constitutes an ongoing legal entitlement for NSTAR to pay certain rates to Cape Wind and pass them down to consumers, whereas the [probation condition in *Tyler* requiring that the rapist acknowledge paternity of the child and abide by any child support orders issued by the Probate and Family Court] did not constitute an ongoing legal entitlement in any way." Pl.'s Opp'n Mem., Dkt. #48 at 20. However, what plaintiffs seek here is precisely analogous to *Tyler* (although much less sympathetic), in that they seek relief from the ongoing "effects" of past state action "in the form of elevated electricity rates over fifteen years," just as Tyler unsuccessfully sought relief from the enduring effects of a state court order.[24]  In rejecting the "ongoing effects" doctrine as a means of

---

[24] *Negron-Almeda v. Santiago*, 579 F.3d 45, 53-54 (1st Cir. 2009), offered by plaintiffs' counsel at the hearing, is no more persuasive. In that case, the court found that the Eleventh Amendment did not bar an order of *prospective* relief, that is, the reinstatement of an unjustly fired public employee, where the remedy did not address monetary damages for a past wrongful termination and where the intent of the order was to conform the future conduct of the state officials involved to the requirements of federal law. *See Papasan v. Allain*, 478 U.S. 265, 278 (1986) ("Relief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law is barred even when the state official is the named defendant. . . . On the other hand, relief that serves directly to bring an end to a present violation of federal law is not barred . . . ."). Here, by contrast, plaintiffs are not seeking

circumventing the Eleventh Amendment, the law is not cruel, but pragmatic in its understanding that the doctrine if applied would have the effect of vitiating the right guaranteed to the States in the Eleventh Amendment to be free from unconsented suits in the federal courts. *See, e.g., Green,* 474 U.S. at 68 ("Both prospective and retrospective relief implicate Eleventh Amendment concerns, but the availability of prospective relief of the sort awarded in *Ex parte Young* gives life to the Supremacy Clause. Remedies designed to end a continuing *violation* of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law. But compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment.") (emphasis added) (internal citations omitted); *Edelman v. Jordan,* 415 U.S. at 668 (noting the *remedy* must be a "consequence of [state] compliance in the future with a substantive federal-question determination" otherwise it "is in practical effect indistinguishable in many aspects from an award of damages against

---

to prevent DPU from approving future contracts between NSTAR and Cape Wind, but to undo a contract already in force by way of a declaration that state officials violated federal law in the past. *See Nat'l R.R. Passenger Corp. v. McDonald,* 2013 WL 5434618, at *13 (S.D.N.Y. Sept. 26, 2013) (quoting *Green,* 474 U.S. at 68) ("Since the [alleged state violation] was complete in 2008, there is no 'ongoing violation of federal law' or 'threat of state officials violating the law in the future.'").

the State . . . resulting from a past breach of a legal duty on the part of the defendant state officials").

Because the Eleventh Amendment requires that this case be dismissed, there is no reason to consider the additional grounds for dismissal advocated by defendants, other than to note that the result would be no different were the court to rule on the substance of the claims, whether brought independently under section 1983,[25] or directly under the Supremacy Clause,[26] or under the dormant Commerce Clause.[27]

─────────────────

[25] "42 U.S.C. § 1983 is properly invoked to redress violations of a federal statute . . . if the statute creates enforceable 'rights, privileges, or immunities,' and if Congress has not foreclosed such enforcement in the statutory enactment itself." *Eric L. By and Through Schreiber v. Bird*, 848 F. Supp. 303, 308 (D.N.H. 1994) (citing *Maine v. Thiboutot*, 448 U.S. 1 (1980) and *Wright v. Roanoke Redev. and Hous. Auth.*, 479 U.S. 418 (1987)). Plaintiffs fail to identify any right privately enforceable under section 1983. *See, e.g., Golden State Transit*, 493 U.S. at 107 (noting that "[t]he Supremacy Clause, of its own force, does not create rights enforceable under § 1983" and further that "[the] Clause is not a source of any federal rights" but rather "*secures* federal rights by according them priority whenever they come in conflict with state law") (internal quotations and citations omitted).

[26] Even assuming that a private citizen has standing (which is to say the least, highly doubtful) to act as a private Attorney General in seeking to secure FERC's Supremacy Clause authority in approving wholesale electricity rates, there is no federal right at stake, given that the DPU order requires NSTAR and Cape Wind to file their rates for approval by FERC. Plaintiffs have essayed this argument before (that DPU violated the FPA by usurping FERC's exclusive jurisdiction to determine wholesale rates) in challenging the DPU's order approving the contract between Cape Wind

ORDER

For the foregoing reasons, the defendants' motions to dismiss are **ALLOWED** with prejudice. The Clerk will enter judgment for defendants and close the case.[28]

---

and National Grid. FERC rejected the argument then, and there is no doubt that it would do so again. *See CARE*, 137 FERC ¶ 61113. Moreover, while it may be a fine point, the FPA reserves to the utility, and not to FERC, the power to establish rates, by contract or otherwise. *See Atl. City Elec. Co. v. F.E.R.C.,* 295 F.3d 1, 10 (D.D.C. 2002). FERC's power to modify wholesale rates only arises after rates have been filed with FERC and found to be unlawful. Thus, what may have influenced a utility's choice in setting its initial rates does not encroach on the statutorily-granted power of FERC to review and approve those rates after the fact. And finally, to the extent that plaintiffs have an interest in FERC's future rate setting, as the FERC noted in the National Grid decision, "[c]omplainants will have the opportunity to intervene in any proceeding seeking Commission approval of those rates." *CARE*, 137 FERC ¶ 61113.

[27] Plaintiffs lack standing to bring suit under the dormant Commerce Clause as they do not compete in the power generation market, as noted by the SJC previously in the National Grid case. *Alliance*, 461 Mass. at 172 n.13. Nor can they claim standing as taxpayers or end-use consumers. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340-349 (2006); *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cnty.*, 115 F.3d 1372, 1381 (8th Cir. 1997).

[28] A final note. In entering this decision, the court takes no position on the underlying merits of siting a wind farm in Nantucket Sound or the wisdom of a state policy that encourages utilities to purchase renewable forms of energy at above-market prices. If instead of a judicial robe, I were to wear the hat of John Muir or Milton Friedman, I might well conclude that the Cape Wind project should have been built elsewhere (or not built at all), or that the NSTAR-Cape Wind contract should never have been approved. But in this case, the Governor, the Legislature, the relevant

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

public agencies, and numerous courts have reviewed and approved the project and the PPA with NSTAR and have done so according to and within the confines of the law.  There comes a point at which the right to litigate can become a vexatious abuse of the democratic process.  For that reason, I have dealt with this matter as expeditiously as possible.